981 A.2d 145

**Ann STIMMLER, Appellant**

v.

**CHESTNUT HILL HOSPITAL; M. Brown, M.D.; William O'Connell, M.D.; Samuel Walterson, M.D.; Walter Matteucci, M.D.; B. Smith, M.D.; M.S. Jayashekara Murthy, M.D.; Bangolor Surey, M.D.; and Richard Padula, M.D., Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 2008.

Decided Sept. 30, 2009.

540

542

Joseph L. Messa, Anastasia M. Buccino–Roth, Messa & Associates, P.C., Philadelphia, for Ann Stimmler, appellant.

Richard A. Kolb, Mary Elizabeth Dixon, White and Williams, L.L.P., Philadelphia, for Chestnut Hill Hosp. and Samuel Walterson, M.D., appellees.

Kyle Norman Thompson, Kilcoyne & Nesbitt, L.L.C., Plymouth Meeting, Mark Hernmanovich, for Walter Matteucci, M.D., appellee.

Barbara S. Magen, Kathleen Chancler, Sheila Ann Haren, Post & Schell, P.C., Philadelphia, for Richard T. Padula, M.D., appellee.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Justice McCAFFERY.

In this medical malpractice appeal, we restate and apply to the record herein the standards and conditions appropriate for granting summary judgment. Determining that the trial court and Superior Court misapplied the appropriate standards in this case, and inappropriately determined this case on "deemed admissions" under the circumstances here present, we reverse and remand for further proceedings. Additionally, we deny the Application for Post–Submission Communication of Ann Stimmler ("Appellant").

Appellant gave birth to her first child at Chestnut Hill Hospital in Philadelphia on May 12, 1965.[1] Several hours after the delivery, she developed peripheral circulatory failure and, within three days, experienced various other complications of delivery, including a hematoma of the pelvic wall. As part of her medical care, Richard T. Padula, M.D. ("Dr. Padula") performed an antecubital cutdown[2] on the inside of Appellant's right elbow on May 13, 1965; and on the following day, he performed the same procedure on the inside of her left elbow.[3] Appellant's condition improved and she was discharged on May 22, 1965. However, because of ongoing complaints of sometimes severe pain, as well as shortness of breath, Appellant received medical care for circulatory and respiratory problems over the course of the next thirty-six years. Appellant was diagnosed with thrombophlebitis and a pulmonary embolism on August 23, 1965; and on various occasions over the years, she was diagnosed as suffering from thrombosis, phlebitis, and/or pulmonary emboli. None of her treating physicians could determine the cause of these conditions until Appellant underwent an echocardiogram on December 30, 1999, which uncovered an echogenic abnormality.

1. The recitation of facts is derived from the allegations set forth in Appellant's third amended complaint and the opinions of the lower courts, unless otherwise stated.

2. A "cutdown" is the "dissection of a vein or artery for insertion of a cannula or needle for the administration of intravenous fluids or medication or for measurement of pressure." *Stedman's Medical Dictionary*, 28th ed., p. 474. The procedure is "[r]equired in patients with vascular collapse due to shock or other causes." *Taber's Cyclopedic Medical Dictionary*, 14th ed., p. C–137 (which further defines "cutdown" as a "surgical procedure for locating a vein or artery to permit intravenous or intra-arterial administration of fluids or drugs"). Dr. Padula described a cutdown as "an opening of the skin, the exposure of a superficial vein, and the insertion of a tubular conduit into it. And that can be therefore used for fluid infusion or whatever the medical doctors want to do." Deposition of Richard T. Padula, M.D., March 22, 2004, at 14. "Antecubital" is defined as "[i]n the front of the elbow; at the bend of the elbow." *Taber's Cyclopedic Medical Dictionary*, 14th ed., p. A–92.

3. Records from Chestnut Hill Hospital indicate that the cutdowns were performed on May 13, 1965 and May 14, 1965, respectively. Appellant's third amended complaint alleges that the procedures were performed on May 15 and 16, 1965.

Subsequent echocardiograms on January 19, 2000, and February 8, 2000, revealed the presence of a twelve- to eighteen-inch catheter, with a chronic appearance, coiled in the right atrium of her heart, passing into and through the right ventricle to the outflow tract.

On October 6, 2001, Appellant filed a medical malpractice action against Chestnut Hill Hospital (the "Hospital") and Drs. M. Brown, William O'Connell, Samuel Watterson, Walter Matteucci, B. Smith, Jayashekara Murthy, Bangloor Surry, and Padula, all of whom had treated Appellant during her hospitalization in May 1965. Appellant filed a third amended complaint on September 18, 2003, in which she alleged that the catheter observed in the echocardiogram was one of the ones used in the 1965 cutdowns. Specifically, Appellant alleged that the doctors had failed to 1) appropriately perform the cutdowns; 2) take appropriate steps to avoid leaving the catheter or a portion thereof in her body following the procedures; 3) recognize that the catheter or a portion thereof remained in her body; 4) properly evaluate and/or interpret her ongoing and deteriorating physical condition after the procedures; 5) order and obtain appropriate diagnostic studies when her condition continued to deteriorate; and 6) inform her of the risks of the cutdown procedures. Appellant also alleged that the Hospital was negligent in that it had failed to 1) use reasonable care to maintain safe and adequate facilities; 2) select and train competent physicians; 3) properly oversee the persons practicing medicine in its facility; 4) formulate, adopt or enforce rules with respect to the performance of cutdowns; 5) properly train doctors, nurses, and staff to detect signs indicating that a catheter still remains in the body; 6) train doctors, nurses, and staff to warn patients of the risks associated with a cutdown procedure; and 7) appropriately supervise its agents. In addition, she alleged that because the catheter in her heart has fragmented, it cannot be safely removed. For this reason, she alleged that her medical conditions would continue to adversely affect her into the future.[4]

4. Indeed, Appellant's expert witnesses have described in their reports many of the potential hazards Appellant faces because of the inoperable

On March 24, 2004, Dr. Padula filed a request for admissions in which he asked Appellant to admit that she had had intravenous ("IV") "catheter devices" inserted during sixteen hospitalizations subsequent to May 1965, namely, at the Hospital, at Roxborough Memorial Hospital, and at Elkins Park Hospital between August 29, 1965 and November 5, 1999. Dr. Padula's discovery document included a request to explain, if Appellant denied having had any IV catheterizations during those hospitalizations, how medications had been administered and procedures accomplished without the use of catheters. Further, Dr. Padula requested that Appellant admit: "[Appellant] has no other information from any source that the foreign object in her body is a piece of IV catheter from her Chestnut Hill Hospital: May 12, 1965—May 22, 1965 admission—the time period at question in this lawsuit—is not from one of the other catheters she has had placed in her medical history." Request for Admission of Defendant, Richard T. Padula, M.D. addressed to Plaintiffs [sic], dated March 24, 2004, No. 3, at 4.

Although Dr. Padula's request for admissions directed that pursuant to Pa.R.C.P. 4014, Appellant was to admit or deny the assertions within thirty days after the date of service, Appellant failed to provide a timely response. Her untimely response was apparently mailed to Dr. Padula's counsel on or about May 10, 2004, approximately forty-seven days after the date the requests for admissions were served. Appellant's unverified response denied that the catheter found in her heart came from any procedure except the May 1965 cutdowns. Appellant asserted that the only time during which she had had a catheter inserted into her, which had not been

presence of the catheter in her body, including the possibility that the catheter, or one of its fragments, could migrate "either deeper into her myocardium, where it could cause serious heart rhythm abnormalities, or into her pulmonary vascular bed, or through the wall of the heart, where it could cause cardiac perforation and pericardial bleed, pericarditis, or death." Supplemental Report of James A. Reiffel, M.D., dated May 26, 2004, at 2. Appellees' expert witnesses, in their reports, dispute the severity of the effect of the catheter's presence in Appellant's heart and further disagree that the catheter will further migrate. *See, e.g.,* Report of Craig M. Oliner, M.D., dated April 20, 2004; Report of Robert D. Smink, Jr., M.D., dated May 3, 2004.

removed, was during that hospital admission. She further asserted that her "treating physicians have related the catheter wire loss into her cardiovascular system to her admission at Chestnut Hill Hospital in August [sic] of 1965." [Appellant's] Response to the Request for Admission of Defendant, Richard T. Padula, M.D., dated April 12, 2004, No. 3, at 2. Moreover, Appellant generally denied having had the sixteen IV catheterizations identified in the request for admissions. Dr. Padula did not move to strike Appellant's response.

Motions for summary judgment were filed by Dr. Watterson and the Hospital (on May 3, 2004), Dr. Padula (on May 4, 2004), and Dr. Matteucci (on May 21, 2004), and Appellant filed timely responses in opposition. On July 14, 2004, the trial court entered separate orders granting the three summary judgment motions. After her motion for reconsideration was denied, Appellant filed a praecipe to discontinue her cause of action against the remaining defendants. The trial court issued a final order discontinuing the action as to all parties on October 1, 2004, and Appellant filed a timely appeal to the Superior Court.

In its opinion supporting its decision to grant the motions for summary judgment, the trial court concluded that "[Appellant's] experts' reports, taken as a whole, failed to establish, to a degree of medical certainty, that [Appellant's] injuries were caused by a fragmented catheter left behind during the removal of catheters from cutdown procedures in May 1965." Amended Trial Court Opinion, dated July 25, 2005, at 4.[5] Appellant had submitted reports and supplemental reports from two expert witnesses: James A. Reiffel, M.D., and Nicholas L. DePace, M.D. As noted by the trial court, Dr. Reiffel stated in his report that of all Appellant's medical procedures, "the one in which there was the 'highest likelihood' of a catheter being inserted which was long enough to account for the findings on the echocardiogram" were the cutdowns in May 1965. Report of James A. Reiffel, M.D.,

5. The original trial court opinion, dated April 7, 2005, and attached to Appellant's brief, was amended to include two lines of necessary text that were omitted from the original.

dated April 4, 2004, at 2. Dr. Reiffel's supplemental report stated that the catheter fragment in Appellant's heart "must have" come from the cutdown in May 1965. Supplemental Report of James A. Reiffel, M.D., dated May 26, 2004, at 1. Dr. DePace, in his supplemental report, "concur[red] with Dr. Reiffel that the anticubital [sic] cutdowns were the most likely source of [Appellant's] catheter migration." Supplemental Report of Nicholas L. DePace, M.D., dated May 27, 2004, at 2. The trial court found that these statements lacked the requisite degree of medical certainty to withstand the defense motions for summary judgment. Amended Trial Court Opinion at 6–8.

The trial court also found that Appellant's experts' reports were based on speculative facts. The trial court reasoned:

Here, Drs. Reiffel and DePace's opinions lacked evidence supporting their conclusions that the May 1965 catheterizations, and not the sixteen others (Dr. Padula's Request for Admissions, dated 3/24/04), were the sole cause of [Appellant's] respiratory and circulatory problems. Dr. Reiffel admitted that he lacked any evidentiary support as to the basis of his opinion. Dr. Reiffel stated, "[A]lthough no details are provided in the hospital records or the deposition material I received to allow a precise determination of how the catheter material came to embolize to the right heart and reside there chronically." [sic] (Expert Report, dated 4/4/04, pg. 2). Yet Dr. Reiffel still opined that there had to be negligence either in the insertion, removal, and/or maintenance of the intravascular catheter. Similarly, it is not clear what, if any, prior medical records Dr. DePace in fact reviewed prior to reaching his conclusion. Dr. DePace makes no reference to reviewing any medical records and/or deposition testimony which would support the conclusions.

*Id.* at 10–11.

The trial court concluded that, "based on the expert reports, [Appellant] would not have been able to prove to a reasonable degree of medical certainty that the foreign object currently found in [Appellant's] heart definitely related to the Chestnut Hill hospitalization. [Appellees], therefore, were entitled to

summary judgment as a matter of law." *Id.* at 12. Notably, the trial court did not give its reasons for concluding that the record supported the assertion that Appellant had undergone sixteen subsequent IV catheterizations. A footnote in the trial court opinion suggests that the court may have come to its conclusion because Appellant had made only "general[ ]" denials that she had undergone subsequent catheterizations and thus had inadequately provided the court with "sufficient evidence regarding the nature of the sixteen procedures." *Id.* at 2 n. 3.

On appeal to the Superior Court, Appellant raised the following two questions for review: 1) whether the lower court abused its discretion or committed an error of law in deeming Dr. Padula's request for admissions admitted; and 2) whether the trial court abused its discretion or committed an error of law in granting the motions for summary judgment. The three-member Superior Court panel initially reversed the trial court. In its memorandum opinion filed November 30, 2006, two members of the panel concluded that, read as a whole, the expert and supplemental reports of Appellant's expert witnesses, Drs. Reiffel and DePace, plainly met the standards for setting forth a *prima facie* case of medical malpractice against Appellees. Judge Maureen Lally–Green dissented. Appellees filed for reconsideration and the then two-member panel [6] reversed itself in a decision filed October 17, 2007. Specifically, the panel opined that because of its determination (and apparently that of the trial court) that it was "deemed admitted" that Appellant had undergone subsequent catheterizations, Appellant would not be able to establish that the May 1965 Chestnut Hill Hospital catheterizations were the cause of her injuries.

The Superior Court determined that the record showed that on March 24, 2004, Dr. Padula asked Appellant to admit that she had had IV catheterizations on sixteen separate occasions

6. The original Superior Court panel consisted of Judge Michael Joyce, Judge Lally–Green, and Senior Judge Justin Johnson. Following the panel's initial decision, Judge Joyce resigned from the bench, reducing the panel on reconsideration to the remaining two judges, Lally–Green and Johnson.

after May 1965. Dr. Padula received Appellant's answer on May 11, 2004. Appellant's counsel's cover letter enclosing the answer was dated April 14, 2004, but the envelope was postmarked May 10, 2004. The Superior Court determined that, pursuant to Pa.R.C.P. 4014(b), a timely answer would have had to have been served by April 23, 2004. The court further noted that in response to Dr. Padula's motion for summary judgment, Appellant averred that she had "responded to said Request for Admissions, a copy of which is attached hereto as Exhibit 'E'," but then failed to address the issue of untimeliness. *Stimmler v. Chestnut Hill Hospital*, No. 2836 EDA 2005, 943 A.2d 331, memorandum opinion at 11, (Pa.Super. filed October 17, 2007).

The Superior Court, in "[a]pplying Rule 4014(b) to the facts of this case," determined that the trial court did not err in deeming admitted Dr. Padula's request for admissions:

Under Rule 4014(b), if the responding party does not timely serve a response, 'the matter is admitted.' The record does not reflect that Appellant served her response on time. It is true that Appellant's response contains a certificate of service dated April 14, 2004. Despite this, Dr. Padula presented specific averments that he was not served until May 10, after the 30–day time frame had expired. Appellant did not meaningfully respond to Dr. Padula's assertion that the mailing was **in fact** untimely. Instead, Appellant relied on a bare assertion that she 'responded' to the request. Moreover, in her memorandum of law, she implicitly admitted that the service was late.

*Id.* at 11–12 (emphasis in original). The court also noted that Appellant had failed to request a withdrawal of the "deemed admissions" pursuant to Pa.R.C.P. 4014(d).

Thus, the Superior Court concluded that Appellant's first claim of error lacked merit. Additionally, the Superior Court determined:

As a result [of the court's disposition of the deemed admission issue], we conclude that Appellant's second claim lacks merit as well. As noted above, the trial court reasoned that

Appellant's claim could not survive summary judgment because all of her allegations are based on the factual premise that her injury took place during the cutdown procedure in 1965. The court further reasoned that if she had catheterizations on 16 other occasions, that factual premise is impermissibly speculative, even given her expert reports. We agree, and therefore affirm the judgment in part based on the trial court's opinion dated July 25, 2005.

*Stimmler*, memorandum opinion at 12–13.

We granted Appellant's Petition for Allowance of Appeal to determine whether the trial court had erred by granting, and the Superior Court had erred by upholding, summary judgment, even assuming that Appellant had undergone the sixteen subsequent IV catheterizations. Specifically, we asked the parties to address the following question: "Whether the Superior Court committed an error of law when it affirmed the trial court's grant of summary judgment on the basis that Dr. Padula's requests for admissions were deemed admitted." Of the defendants, only Appellees Hospital and Dr. Watterson (in a joint brief) and Dr. Padula have filed briefs in this appeal.

Preliminarily, we address Appellees' claims that Appellant has waived all or some of her arguments before this Court. Largely, these arguments are based on what Appellees construe to be Appellant's failure to adequately argue the "issues" of whether the lower courts erred by deeming Dr. Padula's request for admissions admitted under Rule 4014; whether Appellant failed to timely challenge the conclusion that the request for admissions was deemed admitted because the request was not answered in the applicable thirty-day period; and whether Appellant has available remedies concerning the deemed admissions pursuant to Pa.R.C.P. 126. *See* Dr. Padula's Brief at 16–18 and Hospital's and Dr. Watterson's Brief at 10–12. Appellees contend that these "issues" have been waived either because of Appellant's failure to raise them below or because the argument portion of her brief insufficiently addresses them.

■ However, Appellees have misconstrued our order certifying the issue on appeal, and have placed their focus on Rule 4014, rather than on whether summary judgment is appropriate based on the record before the trial court. Our order was derived from the statement of reasons set forth in Appellant's Petition for Allowance of Appeal, wherein Appellant asserted that **even if** Dr. Padula's request for admissions is deemed true, these admissions do not render the opinions of Appellant's expert witnesses speculative. Appellant further asserted that because the opinions of her expert witnesses are not speculative, and because these opinions, read in their entirety, provide the requisite degree of medical certainty to support her claims, the lower courts erroneously granted and upheld summary judgment under established law. *See* Petition for Allowance of Appeal at 7–14. Our order certifying the question to be addressed on appeal reflects the fact that we granted Appellant's petition for the reasons raised in her petition. Thus, rather than waiving the question before us, it is Appellant who addresses the question that we had certified for appeal.[7]

Moreover, we must note that Appellant directly challenged on appeal to the Superior Court the propriety of the trial court deeming admitted Dr. Padula's requests for admissions. *See Stimmler, supra* at 7.[8] Accordingly, except with respect

7. However, Appellant's argument concerning the application of Pa. R.C.P. 126 **is** raised for the first time in her brief filed in this Court. Because Appellant did not raise a Rule 126 argument below, we must consider her argument concerning this rule to be waived; accordingly, we shall not address it. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

8. Additionally, we note that before the trial court, Hospital and Dr. Watterson never asserted in their summary judgment motions and memoranda of law that Appellant's "deemed admissions" were a basis for entering summary judgment. Only Dr. Padula, in a "supplemental" memorandum of law filed after his summary judgment motion (wherein the issue was not raised), raised the issue of "deemed admissions" as a basis for summary judgment. Appellant opposed Dr. Padula's argument at the trial level, arguing that it was inappropriate for Dr. Padula to challenge the sufficiency of her response to the request for admissions by summary judgment motion, citing, among other things, Pa. R.C.P. 4014(c) and *Davis v. Pennzoil Co.,* 438 Pa. 194, 264 A.2d 597,

to Appellant's Rule 126 argument, we reject Appellees' assertions that Appellant's arguments before this Court are waived.[9] We therefore turn to the issue of whether summary judgment was properly granted in this case, even if it is deemed admitted that Appellant had had sixteen IV catheterizations during her hospitalizations that occurred subsequent to May 1965.

 Our review of the grant of summary judgment is informed by the following legal precepts:

> This Court's scope of review of an order granting summary judgment is plenary. Our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or clearly abused its discretion. Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party. When the facts are so clear that reasonable minds cannot differ, a trial court may properly enter summary judgment.

*Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218, 1221–22 (2002) (citations omitted).[10]

As we stated:

608 (1970) (approving of the use of preliminary objections to challenge the sufficiency of a response to a request for admissions). *See* Appellant's Response in Opposition to the Motion for Summary Judgment of [Appellee] Richard T. Padula, M.D., filed June 2, 2004, at 4, and Appellant's Memorandum of Law in support of Appellant's Response, filed June 2, 2004, at 7.

9. Appellees also contend that Appellant waived all argument before this Court because the argument portion of her brief is insufficiently developed. *See* Dr. Padula's Brief at 16–17 and Hospital's and Dr. Watterson's Brief at 10. We disagree. The argument portion of Appellant's brief contains sufficient citation to the record and legal authority, together with analysis, to guide this Court in its review of the issue certified on appeal.

10. Rule 1035.2 of the Rules of Civil Procedure provides:

"The function of the summary judgment proceedings is to avoid a useless trial but is not, and cannot, be used to provide for trial by affidavits or trial by depositions." Goodrich–Amram 2d § 1035.1, p. 423. "That trial by testimonial affidavit is prohibited 'cannot be emphasized too strongly'." *Curran v. Philadelphia Newspapers, Inc.*, 497 Pa. 163, 183, 439 A.2d 652, 662 (1981) citing Goodrich–Amram 2d § 1035(d): 1 at p. 455. In considering a motion for summary judgment, the lower court must examine the whole record, including the pleadings, any depositions, any answers to interrogatories, admissions of record, if any, and any affidavits filed by the parties. From this **thorough** examination[,] the lower court will determine the question of whether there is a genuine issue as to any material fact. On this critical question, **the party who brought the motion has the burden of proving that no genuine issue of fact exists.** All doubts as to the existence of a genuine issue of a material fact are to be resolved against the granting of summary judgment. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466 (1979); Goodrich–Amram, *supra*, § 1035(b): 3, p. 432.

In determining the existence or non-existence of a genuine issue of a material fact, courts are bound to adhere to the rule of *Nanty–Glo v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932) which holds that a court may not summarily enter a judgment where the evidence depends upon oral testimony.

*Penn Center House, Inc. v. Hoffman*, 520 Pa. 171, 553 A.2d 900, 902–03 (1989) (emphasis added).

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2.

 With respect to Appellant's specific cause of action, we observe:

Medical malpractice consists of a negligent or unskillful performance by a physician of the duties which are devolved and incumbent upon him on account of his relations with his patients, or of a want of proper care and skill in the performance of a professional act. Because medical malpractice is a form of negligence, to state a *prima facie* cause of action, a plaintiff must demonstrate the elements of negligence: a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of harm. With all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation.

*Quinby v. Plumsteadville Family Practice*, 589 Pa. 183, 907 A.2d 1061, 1070–71 (2006) (citations omitted).

 An expert witness proffered by a plaintiff in a medical malpractice action is required to testify "to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." *Welsh v. Bulger*, 548 Pa. 504, 698 A.2d 581, 585 (1997); *see also Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 892 (1990). However, expert witnesses are not required to use "magic words" when expressing their opinions; rather, **the substance of their testimony must be examined to determine whether the expert has met the requisite standard.** *Welsh, supra* at 585–86. Moreover, "in establishing a *prima facie* case, the plaintiff [in a medical malpractice case] need not exclude every possible explanation of the accident; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows the defendant's conduct to have been a substantial cause of the harm to [the] plaintiff." *Mitzelfelt, supra* at 892 (citation omitted).

In light of the above authority, we must conclude in this case that the record as a whole provides sufficient evidence for a jury to evaluate whether the catheter that was left in Appellant's body and ultimately lodged in her heart was inserted during the May 1965 procedure performed by Appellees. The following is Dr. DePace's Supplemental Report, in its entirety:

I am writing to supplement a report dated August 4, 2003 regarding [Appellant]. During that expert report I commented on the fact that an intra-cardiac foreign body posed a risk of embolization and endocarditis and was the cause of significant psychological stress. It also was the reason that the patient requires ongoing Coumadin treatment for life with continuous monitoring of blood tests and serial echocardiograms.

I stated in that report that it was apparent that the intravascular catheter migrated into the heart when it became dislodged from a peripheral vein many years ago.

I did not comment on the approximate date of the catheter migration in my initial report, but have subsequently received supplemental information. I reviewed Chestnut Hill Hospital Record Progress Notes regarding [Appellant], who lived at that time at 652 Park Lane, Philadelphia, PA and was under the service of a Dr. O'Connell. In addition to the Progress Notes from Chestnut Hill Hospital, I have likewise reviewed the deposition of Richard T. Padula, M.D. In addition, for the first time I have reviewed the expert report of Dr. James Reiffel, a Cardiologist from Columbia University, College of Physicians and Surgeons, Department of Medicine, New York City.

It is obvious that during the hospitalization of May 1965 bilateral cutdowns were performed. **I concur with Dr. Reiffel that the ant[e]cubital cutdowns were the most likely source of [Appellant's] catheter migration. These by necessity would have been *extremely long catheters* to be used in this technique. One cannot be sure if the migration occurred during the insertion technique or removal technique from the medical records provided**

but *with a reasonable degree of medical certainty* it appears that *this admission would be the culprit admission* in which the event occurred. Of course improper surveillance of these catheters, whether with the insertion or removal technique, would be a deviation from the standard of care and the inability to recognize these also would be a deviation from the standard of care. I also strongly concur with Dr. Reiffel that regardless of the method of the catheter migration or the precise time not being known **during that particular hospital admission,** the conclusions that I have reached would not be altered in any manner. That is to say that the catheter migration into the heart has caused [Appellant] significant morbidity and ongoing medical problem [sic] and anguish, which is for a lifetime, and has predisposed her to life[-]threatening embolic events. This obviously would have been prevented with the proper standard technique, **which would include surveillance of ant[e]cubital catheters in detail.**

Supplemental Report of Nicholas L. DePace, M.D., dated May 27, 2004, at 1–3 (emphasis added).

Dr. Reiffel, in his initial report, noted that he had reviewed, among other things, a transcript of Dr. Padula's deposition; Appellant's admission and treatment records at the Hospital for 5/12/65, 8/12/65, 8/29/65, 11/25/68, 6/15/69, 12/20/73, 4/74, 1993, 1995;[11] and 8/17/98; records from the Hospital of the University of Pennsylvania regarding an admission on 6/23/93 and follow-up care commencing in 7/93; and the echocardiogram reports of 12/30/99, 1/19/00, and 2/9/00, which revealed the catheter fragment embolization. Based on his review of these records and other material, Dr. Reiffel stated as follows:

[Appellant] is certainly a patient who has undergone several hospitalizations and medical evaluations, many related to childbirth, phlebitis and/or pulmonary emboli or suspicion thereof, and others for possible infectious related illness and for injuries. During the course of these hospitalizations, all but one of which were at Chestnut Hill Hospital, intravascu-

---

11. Dr. Reiffel's report is not more precise as to date regarding the 4/74, 1993, and 1995 Hospital records.

lar diagnostic studies and delivery of intravascular therapy were utilized (all being at Chestnut Hill Hospital), including bilateral arm cutdowns in May 1965, repeated venograms, and anesthesia/operative procedures. **Of these, the ones in which there was the highest likelihood of a catheter being inserted** *which was long enough* **to account for the findings on the echocardiograms, and the ones,** *which for technical reasons, were the most likely to result in damage to such a catheter* **were the antecubital cutdowns in May of 1965.** Although no details are provided in the hospital records or the deposition material I received to allow a precise determination of how the catheter material came to embolize to the right heart and reside there chronically, that is, whether it was related to the insertion technique or the removal technique, with a high degree of certainty, I can state that while such complications of intravascular catheterization are recognized, they are beyond the standard of care and virtually always represent negligence in the insertion, removal, and/or maintenance of the intravascular catheter. If additional procedural reports concerning the cutdown, catheter placement, catheter removal, venograms, and operative reports can be found in [Appellant's] hospital records, I would like to see them for possible further clarification of the precise time and mechanism of the apparent catheter fragment embolization. They would not, however, alter the virtual certainty, that negligence was involved in the circumstance of catheter disruption and embolization that the echocardiographic findings appear to indicate.

Report of James A. Reiffel, M.D., dated April 4, 2004, at 2 (emphasis added).

Similarly, in his Supplemental Report, Dr. Reiffel, referring to the May 1965 cutdowns, stated in relevant part: "Thus, **with a high degree of medical certainty, we can be sure** that the catheter fragment in [Appellant's] heart **must have come from the catheters inserted [during the] cutdowns.**"

Supplemental Report of James A. Reiffel, M.D., dated May 26, 2004, at 1 (emphasis added).[12]

**Read in their entirety,** Appellant's expert witness reports express the requisite degree of specificity and medical certainty for Appellant to show a *prima facie* cause of action. Appellant's expert witnesses concluded that a catheter used in the May 1965 cutdowns was the source of the catheter fragment that had been negligently permitted to migrate through Appellant's body, causing her the damages for which she is seeking compensation. Dr. Reiffel gave his unequivocal opinion regarding this matter with "a high degree of medical certainty." *Id.* Moreover, the witnesses' use of the terms "highest likelihood" and "most likely," when read in the context of the respective reports in their entirety, do not connote the degree of equivocation ascribed to these statements by the trial court. Further, contrary to the conclusion of the trial court, it is clear that these physicians consulted multiple records and other sources prior to giving their respective opinions.

Appellant's expert witnesses arrived at their shared conclusions that the catheter fragment came from the May 1965 hospitalization based on (1) the length of the fragment detected in Appellant's heart, and (2) the fragment's state of damage. Further, the opinions of these expert witnesses regarding the length of the catheter as indicative of its origin are supported by the deposition testimony of Dr. Padula, one of the party defendants, who confirms that cutdown procedures involve the use of long catheters.[13] In his testimony, Dr.

12. Immediately before making this statement, Dr. Reiffel noted in his supplemental report that none of the hospital records that he had previously reviewed indicated intravenous catheter insertions. However, it is not clear whether Dr. Reiffel meant that the hospital records failed to reveal **any** catheterizations, such as needle or short peripheral IV catheterizations, or whether these records only failed to reveal the employment of long deep-vein catheter insertions such as those performed on Appellant in May 1965 at the Hospital.

13. However, Dr. Padula testified in his deposition that he could not recall the length of the catheters used in the cutdowns that he performed on Appellant, and the medical records that he had consulted for the deposition apparently did not indicate the length of the catheters

Padula explained that a cutdown involved the insertion of a "tubular conduit" into a superficial vein that can be "threaded up" to a larger vein with "a greater flow rate." Deposition of Richard T. Padula, M.D., March 22, 2004, at 14–16. Dr. Padula further explained that for purposes of introducing medications into a patient, a cutdown is employed **instead of** a needle insertion either because a needle cannot be properly inserted into a vein or because a longer "tubular conduit" is required to direct the flow of medicine into a large, **deep** vein in order to dilute the toxic nature of the medicine more quickly and efficiently. *Id.* at 15–16. Thus, Dr. Padula's testimony supports to some degree the conclusions of Drs. Reiffel and DePace that the length of the catheter fragment detected in Appellant's heart indicated that the catheter fragment was used in a cutdown procedure.[14]

Moreover, the fact that Appellant's expert witnesses had identified the catheter fragment as one used in a cutdown

used for the cutdowns. Deposition of Richard T. Padula, M.D., March 22, 2004, at 18–19. The length of the catheter appearing in Appellant's heart is alleged to be twelve to eighteen inches long.

14. We also note that there is evidence in the record from Hospital and Dr. Watterson's expert witnesses that, while not specifically identifying the catheter fragment as coming from the May 1965 procedures, is supportive of Appellant's claim that the catheter fragment found in her heart originated from the antecubital cutdowns of May 1965. Craig M. Oliner, M.D., provided Hospital and Dr. Watterson with an extensive report summarizing Appellant's lengthy medical history, which history apparently involved several IV catheterizations. Dr. Oliner then states, with respect to the issue of the fragmented catheter's origin: "If one of [the May 1965 antecubital cutdown] catheters migrated to the right heart, it is highly likely that by January 2000 [when the catheter was identified], the catheter was embedded and endothelialized." Report of Craig M. Oliner, M.D., dated April 20, 2004, at 14. Dr. Oliner states earlier in his report, that a cardiovascular interventional radiology specialist, in and around the time of the catheter's discovery in Appellant's body, opined, "as suggested by CT [scan] and natural history, catheter is likely embedded in wall [of the heart]." *Id.* at 11. Further, Robert D. Smink, Jr., M.D. stated in his report that "[t]he catheter has unequivocally been there [in Appellant's heart] for many years," and "is unequivocally lodged and encased within the structures of the vascular system" and "has certainly become endothelialized." Report of Robert D. Smink, Jr., M.D., dated May 3, 2004, at 4. These medical reports are attached, with others, to Appellant's Motion for Reconsideration of Summary Judgment Granted to [Hospital], filed July 22, 2004, Ex. "L."

procedure because this type of catheter is physically distinguishable from other types of catheters, contradicts the lower courts' conclusions that the reports of these expert witnesses were speculative. The lower courts determined that Dr. Reiffel's and Dr. DePace's opinions were speculative in light of the "deemed admission" that Appellant had undergone sixteen hospitalizations subsequent to the May 1965 hospitalization that involved the use of IV catheters for the administering of medicines. However, even assuming that Appellant actually had sixteen subsequent IV catheterizations, a jury would still be left with sufficient information to evaluate whether the catheter found lodged in Appellant's heart came from the May 1965 hospitalization.

Dr. Padula's request for admissions never specifically requested that Appellant admit to undergoing subsequent cutdowns or any procedure that required the insertion of a long intravenous catheter of a kind that could match the description of the catheter found in Appellant's body. The request for admissions merely requested that Appellant admit or deny that she had "placement of a **catheter device** inserted into her body for the purpose of medical diagnosis and/or treatment, as per her medical records" with respect to sixteen specific hospitalizations. Request for Admissions of Defendant, Richard T. Padula, M.D. addressed to Plaintiffs [sic], dated March 24, 2004, No. 1, at 1 (emphasis added). More specifically, the request for admissions assert that Appellant had had sixteen IV catheters for (a) "injection for a urogram;" (b) "medical administration;" (c) "medical administration;" (d) no specific reason stated; (e) "a Heparin drip;" (f) "a venogram;" (g) no specific reason stated; (h) no specific reason stated; (i) no specific reason stated; (j) "administration of medications;" (k) no specific reason stated; (*l*) "post-op PCA;"[15] (m) "sedat[ion]" and other unstated reason; (n) "sedat[ion]" and other unstated reason; (o) "sedat[ion]" and other unstated

---

15. "PCA" is not more specifically defined in the request for admissions. It may stand for either "passive cutaneous anaphylaxis," "patient-controlled analgesia," or "patient-controlled anesthesia." Stedman's Medical Dictionary, 28th ed. at 1444. However, whatever the procedure, Appellees do not assert that a lengthy catheter was involved.

reason; and (p) "sedat[ion]" and other unstated reason. *Id.* No. 1(a)-(p) at 2–4.

It is the burden of the party moving for summary judgment to prove that no genuine issue of material fact exists. *Penn Center House, Inc.,* 553 A.2d at 903. However, Dr. Padula's request for admissions, even if admitted or deemed to be true, do not challenge the common conclusion of Drs. Reiffel and DePace that the catheter fragment came from the May 1965 cutdowns based on the evidence of the fragment's length and condition. Rather, these request for admissions do not appear to concern themselves with anything other than what appears to be Appellant's medical history of experiencing the insertion of commonly used catheters of typically very short length, or even needle insertions, in peripheral veins.[16] Notably, there is no request for admissions concerning the placement of any catheter that could match the length of the one found in Appellant's body, *e.g.,* a cardiac catheter or a peripherally inserted central catheter ("PICC"), which is inserted into the superior vena cava via a peripheral vein. Stedman's Medical Dictionary, 28th ed. at 327. Moreover, Appellees do not argue that the record shows that Appellant experienced any cutdowns except for those occurring during the May 1965 hospitalization. Nor do Appellees assert that the record supports the conclusion that any of Appellant's subsequent IV catheterizations involved a catheter long enough to be the one catheter found in Appellant's heart.[17]

16. A review of medical sources indicates that peripheral IV catheters are very short indeed, "typically three-quarter inch to one inch long." Ron Stoker, *Safety Peripheral IV Catheters,* MANAGING INFECTION CONTROL, August 2006, at 14; *see also Intravenous therapy,* Wikipedia, en.wikipedia.org/wiki/Intravenous_therapy (Peripheral IV lines are "the most common intravenous access method in both hospitals and pre-hospital services. A peripheral IV line consists of a short catheter (a few centimeters long) inserted through the skin into a peripheral vein, any vein that is not in the chest or abdomen.").

17. As Dr. Padula states in his brief, record evidence shows that between 1965 and 1999, Appellant received intravenous medications during sixteen hospitalizations subsequent to the May 1965 hospitalization. Dr. Padula's Brief at 12. Dr. Padula does not identify any evidence indicating that any of these episodes of intravenous catheterizations involved catheters of such length or substance that any of them could

Thus, Appellant's "deemed admissions" to the above IV catheterizations, which presumably merely confirms what is apparent in Appellant's medical records, do not render the opinions of Drs. Reiffel and DePace speculative concerning the origin of the twelve- to eighteen-inch catheter fragment found in Appellant's heart. Stated another, more metaphorical way, the lower courts erred by using the oranges of the "deemed admissions" to render null the apples of Appellant's expert witness reports on the issue of the identity of the catheter found in Appellant's body.

However, one "deemed admission," not mentioned by either the trial court or the Superior Court, but prominently cited by Dr. Padula in support of his argument before us, averred that Appellant "has no other information from any source" that the catheter in her body "is not from one of the other catheters she has had placed in her medical history." *See* Request for Admission of Defendant, Richard T. Padula, M.D. addressed to Plaintiffs [sic], dated March 24, 2004, No. 3, at 4. This "admission" would superficially appear to contradict Appellant's theory that the injurious catheter fragment originated from the May 1965 cutdowns. However, because Appellees have failed to show that the record establishes that Appellant had any medical procedure, other than the May 1965 cutdowns, that involved catheters of the length and quality of that found lodged in Appellant's heart, Dr. Padula's request for admission No. 3 cannot provide a basis for entering summary judgment. Again, the factual foundation for this request for admission is insufficient to support the conclusion that it wishes to reach: that the twelve- to eighteen-inch catheter found in Appellant's body could have originated from **any** of Appellant's many IV catheterizations, including those that undoubtedly involved only needle insertions or catheters of several centimeters in length. Thus, it is apparent that the lower courts erred when they concluded that the record, even with the "deemed admissions," is clear and free from all doubt

be the catheter discovered coiled in Appellant's heart, nor does Hospital and Dr. Watterson make any such identification in their brief.

that Appellant will be unable to establish that the catheter found in her body originated from the May 1965 cutdowns.[18]

**18.** We further note that the Superior Court's application of the "deemed admissions" is problematic in view of the letter and intent of Pa.R.C.P. 4014. Requests for admissions pursuant to Rule 4014 are a discovery tool intended to clarify issues, expedite the litigation process, and promote a decision based on the merits. *Brindley v. Woodland Village Restaurant, Inc.*, 438 Pa.Super. 385, 652 A.2d 865, 871 (1995) (citing *Commonwealth v. Diamond Shamrock Chemical Co.*, 38 Pa. Cmwlth. 89, 391 A.2d 1333, 1336 (1978) and quoting Goodrich–Amram 2d § 4014:1, p. 444) ("The purpose of the procedure provided in Rule 4014 is to clarify issues raised in prior pleadings with the goal of expediting the litigation process. [ ] Rule 4014 is designed to expedite the production and authentication of evidence that is not controverted by the litigants.") (quotation marks and parentheses omitted). Rule 4014 permits the court to modify the time for responding to requests for admissions (Pa.R.C.P. 4014(b)); places the burden on the requesting party to move for the clarification and enforcement of defective answers (Pa.R.C.P. 4014(c)); and permits the withdrawal of or amendment to answers to requests for admissions "when the presentation of the merits of the action will be subserved [*i.e.*, promoted] thereby" and where the requesting party has failed to establish that the withdrawal of or amendment to answers to requests for admissions will prejudice that party "in maintaining the action or defense on the merits." (Pa.R.C.P. 4014(d) (emphasis added)).

The emphasis of the rule that a case is to be determined on the merits is reflective of the fact that the rule was intended to conform to "Fed. R.Civ.P. 36, as amended in 1970." Pa.R.C.P. 4014 Explanatory Comment of 1978. As the Commonwealth Court observed, federal courts have interpreted Federal Rule 36 as liberally permitting withdrawal or amendment of responses to requests for admissions "where upholding the admission would practically eliminate any presentation of the merits of the case; where withdrawal would prevent manifest injustice; and where the party who obtained the admissions failed to prove that withdrawal would result in prejudice to that party." *Dwight v. Girard Medical Center*, 154 Pa.Cmwlth. 326, 623 A.2d 913, 916 (1993) (citing *Westmoreland v. Triumph Motorcycle Corp.*, 71 F.R.D. 192 (D.Conn. 1976)); *see also Pritchard v. Dow Agro Sciences*, 255 F.R.D. 164, 172 (W.D.Pa.2009) ("A motion to withdraw admissions is most likely to be granted where (1) upholding the admissions would be to practically eliminate any presentation of the merits, and (2) the admissions resulted from brief delays or inadvertent technical deficiencies that were promptly corrected without undue burden from the requesting party.") (citation omitted).

In *Dwight*, the Commonwealth Court held that the trial court erred by granting summary judgment for the defendant based on deemed admissions where the plaintiff filed a late response denying most of the admissions, **and** where the trial court entered an order granting the defendant's motion to strike the plaintiff's response. The Commonwealth Court concluded that Rule 4014's provisions regarding withdrawal or amendment of admissions prohibited the trial court from

Finally, the individual Appellees, Dr. Padula and Dr. Watterson, argue that Appellant has failed to adduce evidence that **individually** they acted with negligence during the May 1965 hospitalization. Dr. Padula cites his deposition testimony in support of his argument that he did not act negligently, noting specifically that his testimony "established" that he was not the physician who removed the cutdown catheters. *See* Dr. Padula's Brief at 49–51 (citing Deposition of Richard T. Padula, M.D., March 22, 2004, at 49–51). *See also* Hospital and Dr. Watterson's Brief at 29 (arguing generally, and without citation to the record, that Appellant has failed to identify "specific acts of negligence on the part of an individual Defendant"). Aside from the fact that at least Dr. Padula's argument seems to be inappropriately based on testimonial evidence contrary to the *Nanty–Glo* Rule,[19] we note that the trial court did **not** grant summary judgment based on a determination that the record fails to show a question of material fact concerning the

entering summary judgment on deemed admissions, where the opposing party had, as in the instant case, actually controverted the admissions, albeit in an untimely manner. *Id.* at 915–16. (Additionally, the Commonwealth Court determined that summary judgment was inappropriate where the requests for admissions concerned conclusions of law).

Here, the Superior Court had before it a record that contained Appellant's response (albeit late) to the requests for admissions, and no formal determination by the trial court regarding Appellant's response, only a determination set forth in the trial court opinion that was certainly open to interpretation. Considering that Appellant had denied the material request for admissions, that the trial court had made no formal determination regarding Appellant's late response, and that Rule 4014 allows for a flexibility (and does not impose or suggest a rigid construction) designed to ensure that a case is determined on its merits, the Superior Court was "quick on the trigger," so to speak, in determining that summary judgment on the "deemed admissions" in this case was appropriate.

However, contrary to the stated concerns of the concurrence, we emphasize that we do not condone non-compliance with the Rules of Civil Procedure, nor do we posit or suggest that any court should have stepped into counsel's shoes to make a motion to withdraw "deemed" admissions. We fully acknowledge that under appropriate circumstances, deemed admissions may support a grant of summary judgment. Those circumstances are not present in the instant case based on the record as it now stands.

19. *See Penn Center House*, 553 A.2d at 902–03.

negligence of any individual physician. The trial court confined its grant of summary judgment to the issue of whether Appellant could show that the catheter fragment in her heart came from the May 1965 cutdowns. We will not make the initial determination of whether summary judgment is appropriate for any individual physician defendant; rather, such matters properly rest initially with the trial court, which can evaluate, under the theories of negligence advanced by Appellant, whether the record supports summary judgment on this issue.

To conclude, we hold that the trial court and Superior Court erred in granting and upholding, respectively, the summary judgment motions of Appellees because, based on the record as a whole and considering the requirements for entitlement to summary judgment, this case is not free from doubt that genuine issues of material fact exist. Accordingly, the order of the Superior Court is reversed, and this matter is remanded to the trial court for further proceedings.[20]

Justices EAKIN and BAER and Justices TODD and GREENSPAN join the opinion.

Justice SAYLOR files a concurring opinion in which Chief Justice CASTILLE joins.

Justice SAYLOR, concurring.

I have substantial reservations about the majority's treatment of deemed admissions under Rule of Civil Procedure 4014. Initially, the majority indicates that our Order allowing the appeal was not intended to encompass the issue of whether the relevant facts were appropriately deemed admitted under Rule 4014. *See* Majority Opinion, at 550–53, 981 A.2d

**20.** On October 27, 2008, Appellant filed an Application for Post–Submission Communication. In this document, Appellant makes additional argument connected to issues argued before this Court on October 20, 2008. This Court did not invite counsel to submit additional argument, and Appellant does not allege any modification or reversal of authority relied on by either party that would necessitate the filing of such a communication. *See* Pa.R.A.P. 2501(a) and (b). Accordingly, Appellant's application is denied. *See Commonwealth v. Abdul–Salaam*, 571 Pa. 219, 812 A.2d 497, 504 n. 3 (2002).

at 152–53. Later in the opinion, however, the majority offers a lengthy footnote criticizing the Superior Court for acting "quick on the trigger" in recognizing the admissions were deemed. *See* Majority Opinion, at 564–65 n. 18, 981 A.2d at 160 n. 18.

To the extent the discussion is appropriately in the case, I differ with the majority's treatment of the Superior Court's approach. Rule 4014 provides that matters of which an admission is requested are "admitted[, subject to limited exceptions not relevant here,] unless, within thirty days after service of the request, ... the party to whom the request is directed serves upon the party requesting the admission an answer verified by the party or an objection, signed by the party or by the party's attorney." Pa.R.Civ.P. No. 4014(b). Furthermore, the Rules stress that "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Pa.R.Civ.P. No. 4014(d). Here, their straightforward operation resulted in the deemed admission found by the Superior Court, as it appears to be essentially undisputed that Appellant did not serve the timely, verified response required to avoid the deemed admission.

The majority faults the Superior Court for failing to recognize that the trial court had before it a record that contained Appellant's response (which Appellant attached to its memorandum opposing summary judgment). *See* Majority Opinion, at 564–65 n. 18, 981 A.2d at 160 n. 18. This circumstance, however, is irrelevant under the rules, which recognize the deemed admission upon the expiration of the period allowed for response and place the burden squarely on the admitting party to move affirmatively for relief from the admission. While the majority is correct that our rules are to be liberally interpreted in the interests of justice, I cannot fault the Superior Court for understanding they cannot be ignored.

Here, Appellant's counsel appears, in the first instance, to have attached an inaccurate certificate of service to the request for admissions. Instead of moving for relief under Rule 4014(d) once it was understood that there may have been a mistake, at the very least, in the dating of the certificate (as

well as in failing to include the required verification), counsel merely advanced the erroneous legal position that the matters admitted by operation of the Rules could not be taken as admitted at the summary judgment stage. *See* Memorandum of Law In Support of Plaintiff's Response In Opposition to the Motion for Summary Judgment of Defendant Richard T. Padula, M.D., R.R. at 428 ("Plainiff's response to Defendant's Request for Admission may have been delayed in being sent to Defendant, however, a Motion for Summary Judgment is not the proper medium to challenge such a submission."). I cannot agree with the majority that either the trial court or the Superior Court was obliged to step into counsel's shoes to make the necessary motion. There are countless instances in the law where attorneys' or their clients' own derelictions have affected the availability of relief in the judicial forum. The orderly administration of justice, quite simply, cannot proceed without some structure.

Regarding the summary judgment decision, I agree with the majority's conclusion that it is not sufficiently clear, on this record, that other instances of catheterization could have accounted for Ms. Stimmler's injury to support the award of summary judgment. In the present landscape, I do not reach a final conclusion concerning the effect of Appellant's deemed admission that Appellant "has no information from any source" that the catheter in her body "is not from one of the other catheters she has had placed in her medical history," particularly in light of the representations that Appellant's expert reports (which obviously represented this form of information) were provided to Appellees prior to the date the deemed admissions became effective. Rather, since such matter was not considered by either the Superior Court or the trial court, I would leave it for resolution on the remand, together with all other outstanding and further matters the parties have pursued or may pursue.

Chief Justice CASTILLE joins this concurring opinion.