# Catlin v. Hamburg

*John A. Caputo* and *Carmen F. Lamancusa,* for plaintiffs.

*Judith A. Moses,* for defendants.

PICCIONE, *J.,* July 20, 2011—Before this court for disposition is the motion in limine filed on behalf of defendants Marc Hamburg, M.D., St. Francis Hospital of New Castle, and St. Francis Physicians, Inc. (hereinafter, "defendants"). This action arose out of medical treatment provided by Dr. Hamburg to plaintiff Natalie Catlin following the birth of her child. On March 24, 1999, Ms. Catlin underwent a postpartum tubal occlusion in which Dr. Hamburg performed a modified Pomeroy procedure on her right fallopian tube and a Filshie Clip on her left fallopian tube. In February of 2000, Ms. Catlin sought treatment from Dr. Hamburg after she began experiencing pain in her abdominal area and very light periods. Dr. Hamburg conducted an internal pelvic exam and advised Ms. Catlin that she was not pregnant. Shortly thereafter, her primary care physician recommended that she undergo additional testing. On May 25, 2000, a blood test and sonogram revealed that Ms. Catlin was 19 weeks

pregnant. She did not decide to terminate the pregnancy until June 1, 2000, when additional testing revealed that the fetus had various congenital anomalies. On June 7, 2000, Ms. Catlin was admitted to Magee Womens Hospital and underwent an abortion. Due to postoperative bleeding, a second ultrasound was performed and revealed some retained products of conception. As a result, a second curettage of the uterus was performed. On June 8, 2000, Ms. Catlin was placed in the Intensive Care Unit for observation, and, on June 9, 2000, she was diagnosed with symptomatic anemia and given several transfusions. Upon cessation of the bleeding, Ms. Catlin was discharged in stable condition on June 11, 2000.

On March 21, 2001, plaintiffs Natalie and Vernon Catlin (hereinafter, "plaintiffs") commenced this action against defendants. After a complaint and preliminary objections to that complaint were filed, plaintiffs filed an amended complaint in which they allege that Dr. Hamburg was negligent in performing Ms. Catlin's tubal occlusion and in failing to diagnose her pregnancy. During the course of discovery, plaintiffs produced the report of their medical expert, Bruce L. Halbridge, M.D. In his report, Dr. Halbridge asserts that the failure of Dr. Hamburg to perform a modified Pomeroy procedure on Ms. Catlin's left fallopian tube as he did on the right tube directly resulted in Ms. Catlin's pregnancy, the necessity to terminate that pregnancy, and the resulting post-abortal hemorrhage. Dr. Halbridge also asserts that Dr. Hamburg's failure to diagnose Ms. Catlin's pregnancy directly resulted in her inability to terminate her pregnancy at an early stage, reducing the risk of a post-abortal hemorrhage. In addition,

Dr. Halbridge claims that Dr. Hamburg's failure to provide adequate informed consent prior to the tubal occlusion ultimately led to the injuries sustained by plaintiffs.

On February 24, 2011, defendants filed the instant motion in limine, followed by a supplemental motion on June 15, 2011. In their motion, defendants raise the following issues and assertions:

I. Plaintiff's expert's opinions related to defendant's negligence for lack of informed consent must be stricken.

II. The opinions of Dr. Halbridge should be stricken in their entirety.

III. Should the jury find that the sterilization procedure was performed within the standard of care, then plaintiff may not recover for costs associated with termination of her pregnancy

IV. Plaintiff may not recover for damages for psychological pain and suffering and wage loss and other damages alleged in her complaint, into the indefinite future.

V. Whether plaintiff's claim of wage loss is recoverable.

Defs' Mt. in limine. On June 28, 2011, this court heard oral argument on defendants' motion in limine. During the argument, the parties represented to the court that plaintiffs are not asserting a claim for lack of informed consent. Therefore, Dr. Halbridge's opinions relating to lack of informed consent are stricken.

Defendants next assert that all of Dr. Halbridge's opinions should be stricken. They argue that his opinions regarding negligent sterilization and failure to diagnose Ms. Catlin's pregnancy lack a medical or scientific basis. In his report, Dr. Halbridge claims Dr. Hamburg could have prevented Ms. Catlin's pregnancy if he had performed a modified Pomeroy procedure on the left fallopian tube. Defendants argue that Dr. Halbridge has no medical or scientific basis for believing that the Filshie Clip on the left tube failed or that the ovum was fertilized from the left tube. As a result, defendants seek to strike Dr. Halbridge's opinion and testimony.

To prevail in a medical malpractice suit, a plaintiff must plead and prove that the physician owed a duty to the patient, that the physician breached the duty, that the breach was the proximate cause of or a substantial factor in harming the patient, and that the damages suffered by the patient were a direct result of the harm. *Winschel v. Jain,* 925 A.2d 782, 788 (Pa. Super. 2007) (citing *Corrado v. Thomas Jefferson University Hospital,* 790 A.2d 1022, 1030 (Pa. Super. 2001)). Expert testimony is generally required to establish the elements of duty, breach, and causation, unless the medical malpractice is obvious and self-evident. *Quinby v. Plumsteadville Family Practice, Inc.,* 589 Pa. 183, 199, 907 A.2d 1061, 1070 (2006). In order for expert testimony to be admissible, the testimony must be rendered within a reasonable degree of medical certainty. *Carrozza v. Greenbaum,* 866 A.2d 369, 379 (Pa. Super. 2004). "However, expert witnesses are not required to use 'magic words' when expressing their opinions; rather, the substance of their testimony must be examined

to determine whether the expert has met the requisite standard." *Stimmler v. Chestnut Hill Hospital*, 602 Pa. 539, 555, 981 A.2d 145,155 (2009) (emphasis removed). The jury is then charged with fact-finding and credibility assessments. *Winschel*, 925 A.2d at 788.

A review of the report indicates that Dr. Halbridge expresses his opinion with a reasonable degree of medical certainty. He does not state that the failure to use the modified Pomeroy procedure on the left fallopian tube "possibly" or "could have" led to Ms. Catlin's pregnancy and ultimately the termination of the pregnancy. Therefore, Dr. Halbridge expresses his opinion with the requisite level of certainty. The fact that the pregnancy could have resulted in a different way does not render Dr. Halbridge's opinion inadmissible. A plaintiff is not required to exclude every possible explanation to establish a prima facie case. *Stimmler*, 981 A.2d at 155. It is enough that reasonable minds are able to conclude that the preponderance of the evidence shows that Dr. Hamburg's omission was a substantial cause of the harm. *Id.*

Furthermore, Dr. Halbridge provides support for his opinion in his report. He quotes Dr. Hamburg's notes from Ms. Catlin's operation, which indicate that Dr. Hamburg originally applied a Filshie Clip to the right fallopian tube but, when the clip slid from the right tube, Dr. Hamburg performed the modified Pomeroy procedure on the right tube. Dr. Halbridge theorizes that Dr. Hamburg's failure to perform a modified Pomeroy procedure on the left tube increased the risk of Ms. Catlin becoming pregnant. In support of his theory, Dr. Halbridge also quotes from the operative record of Dr. Zyczynski, who performed

a hysterectomy on Ms. Catlin. The record indicates that one of the clips was found on the surgical field after manipulating the uterine specimen and that the other clip was identified on the fallopian tube. Dr. Halbridge further argues that, because both fallopian tubes were of the same or similar diameter, the clip would have slid from the left tube if it slid from the right tube. Finally, Dr. Halbridge supports his theory with statistics indicating that the failure rate of Filshie Clips is as high as 8.6 pregnancies per 100 women at the end of two years while the failure rate of sterilization utilizing the modified Pomeroy technique is approximately 0.6 pregnancies per 1000 women at the end of one year. "Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not the increased risk was a substantial factor in producing the harm." *Mitzelfelt v. Kamrin,* 526 Pa. 54, 63-64, 584 A.2d 888, 892 (1990) (citing *Hamil v. Bashline,* 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978)). Dr. Halbridge sufficiently supports his opinion to meet this preliminary burden.[1]

Defendants also argue that Dr. Halbridge's opinion regarding Dr. Hamburg's failure to diagnose Ms. Catlin's pregnancy is without foundation. Dr. Halbridge asserts that Dr. Hamburg's failure to diagnose the pregnancy on February 28, 2000 resulted in the failure to terminate the

---

1. The court notes that both parties have cited cases addressing the issue of an expert's testimony falling outside of the fair scope of that expert's report. There is no indication that Dr. Halbridge's testimony will contain theories or assertions that are outside the fair scope of his report. Therefore, the court finds that any such argument is also without merit.

pregnancy at an early stage and thereby reduce the risk of a post-abortal hemorrhage. Defendants claim that Ms. Catlin did not choose to terminate the pregnancy until she learned that the fetus had various congenital anomalies, and, as a result, an earlier diagnosis by Dr. Hamburg would not have caused her to seek an abortion at an earlier stage. Although the parties agree that Ms. Catlin decided to seek an abortion only when she learned of the congenital anomalies, it does not follow that an earlier diagnosis of the pregnancy would not have led to an earlier decision to terminate the pregnancy. Had Dr. Hamburg discovered the pregnancy at six to seven weeks, Ms. Catlin may have sought additional testing that would have revealed the defects at an earlier time. She also may have opted to terminate the pregnancy knowing that there was lesser risk involved at the earlier stage. Based on these considerations, the court concludes that Ms. Catlin's initial decision not to terminate the pregnancy does not render Dr. Halbridge's opinion moot, as defendants argue.

Defendants' remaining three issues involve the damages to which plaintiffs are entitled in the event that they satisfy their burden of proof. Defendants first argue that plaintiffs cannot recover for anxiety and psychological damage and pain and suffering related to the termination of Ms. Catlin's pregnancy. The applicable statute states, in part, that "[n]othing contained in this subsection shall be construed to prohibit any cause of action or award of damages for the wrongful death of a woman, or on account of physical injury suffered by a woman or a child, as a result of an attempted abortion." 42 Pa.C.S.A. § 8305(a). As a result, plaintiffs may recover damages in connection with the termination

of the pregnancy. Specifically, if plaintiffs sustain their burden of proof, they are "entitled to recover all medical expenses and lost wages related to pre-natal care, delivery, and post-natal care, as well as compensation for pain and suffering incurred during the pre-natal through post-natal periods." *Hatter v. Landsberg*, 563 A.2d 146, 150 (Pa. Super. 1989) (citing *Mason v. Western Pennsylvania Hospital*, 499 Pa. 484, 486, 453 A.2d 974, 976 (1982)). Therefore, plaintiffs may recover for pain and suffering related to the termination of Ms. Catlin's pregnancy.

Defendants next argue that plaintiffs may not recover for pain and suffering, wage loss, and other damages into the indefinite future. As stated above, plaintiffs may recover damages related to the pregnancy that were incurred during the pre-natal through post-natal periods. The amount of such damages is a question for the jury to decide based on the evidence presented by both parties. The same reasoning applies to defendants' final issue. Whether plaintiffs are entitled to 29 weeks or six to eight weeks of wage loss payments is a question for the jury.

## ORDER OF COURT

And now, July 20, 2011, the court having heard oral argument on June 28, 2011 regarding defendants' motion in limine, with John A. Caputo, Esquire and Carmen F. Lamancusa, Esquire, appearing and representing the plaintiffs, and Judith A. Moses, Esquire, appearing and representing the defendants, it is hereby ordered and decreed:

1. Defendants' motion in limine is granted in part and denied in part pursuant to the attached opinion.

a. The portion of plaintiffs' expert's opinion regarding lack of informed consent shall be stricken.

b. Defendants' motion in limine is denied in all other respects.

2. The Prothonotary shall properly serve notice of this order and attached opinion upon counsel of record.