**GENEVA HOUSE, INC., Appellant**

v.

**MINSEC OF SCRANTON, INC. and Iannielli Family Limited Partnership.**

Commonwealth Court of Pennsylvania.

Argued June 6, 2011.

Decided July 1, 2011.

Andrew Hailstone, Scranton, for appellant.

John G. McDougall, Wallingford, for appellee Minsec of Scranton, Inc.

BEFORE: SIMPSON, Judge, and McCULLOUGH, Judge (P), and KELLEY, Senior Judge.

OPINION BY Judge SIMPSON.

In this second appeal, Geneva House, Inc. (Geneva) asks whether the Court of Common Pleas of Lackawanna County (trial court) erred in granting summary judgment in favor of Minsec of Scranton, Inc. (Minsec) and dismissing Geneva's zoning enforcement action under Section 617 of the Pennsylvania Municipalities Planning Code[1] (MPC). The trial court determined Geneva lacked standing to bring an enforcement action under Section 617 because it did not prove it was substantially affected by Minsec's alleged unlawful use of its property as a community corrections center.[2] Concluding Geneva has standing

1. Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 10617.

2. As set forth more fully below, this case was previously before a panel of this Court on Geneva's appeal of the trial court's decision dismissing its amended complaint at the preliminary objection stage. Ultimately, we reversed the trial court's decision on preliminary objections and directed the case to pro-

to bring this enforcement action and material issues of fact exist as to whether Minsec is operating in violation of applicable zoning requirements, we reverse.

## I. Factual and Procedural Background

This case has a fairly extensive factual and procedural background. An explanation of that background is necessary.

Geneva owns and operates a high-rise apartment building for the elderly and handicapped at 325 Adams Avenue in the City of Scranton. Iannielli Family L.P. (Iannielli) owns a four-story building at 537–539 Linden Street in the City (subject property).[3] Geneva's property adjoins the north side of the subject property.

Minsec leases the upper floors of the subject property. Since 2002, it has used the subject property to operate a community corrections center, which is known as the Wyoming Valley Correctional Center.

Sometime prior to 1982, Iannielli applied for and received permission for a tenant to use the vacant second floor of the four-story structure on the subject property to house an adult mental health/mental retardation (MH/MR) transitional living program. Thereafter, Iannielli obtained a variance to convert the third and fourth floors to the same use by a second tenant. The upper floors remained occupied by various tenants until approximately 1998.

In January 2000, an entity known as Diversified Health Associates, Inc. (Diversified) sought to use the second, third and fourth floors of the subject property as a "specialized living facility . . . to be used by the judicial system wherein the [c]ourt refers persons [with drug or substance

abuse problems] for a ninety-day monitoring period." (2000 zoning case). Reproduced Record (R.R.) at 91a; Tr. Ct., Slip Op., 6/29/00, at 2. Diversified filed an application with the City of Scranton Zoning Hearing Board (ZHB), seeking a special exception to reestablish a nonconforming use or, alternatively, seeking a variance. The ZHB denied Diversified's requests.

On Diversified's appeal, the trial court determined the ZHB abused its discretion in denying continuation of a valid nonconforming use. In its decision, the trial court identified the prior nonconforming use as "transitional living spaces on the third and fourth floors of the [subject] property for the MH/MR." R.R. at 97a. The trial court determined Diversified's proposed use, a transitional living space for up to 15 individuals per floor with addiction problems, was sufficiently similar to the prior nonconforming use as a transitional living space for those with mental illnesses. *Id.* The trial court further determined Diversified could expand the size of the prior nonconforming use, which occupied two floors, to include a third floor. The trial court explained:

> It is clear from the testimony that the space on all three floors is identical and no additional major construction work is needed. All three floors have been used in the past for transitional living programs without any apparent objection from the City. [Diversified and Iannielli] now wish to put in a transitional living space for up to 15 males per floor. This current project would be an expansion of the transitional living spaces that once occupied the structure. . . . [T]he slight increase in the amount of residents does

---

ceed. *See Geneva House, Inc. v. Minsec of Scranton, Inc.,* 911 A.2d 248 (Pa.Cmwlth., No. 2525 C.D.2005, filed November 3, 2006) (unreported).

**3.** This Court previously issued an order precluding Iannielli from filing a brief or participating in oral argument.

not prevent the continuation of the nonconforming use.

R.R. at 98a. The trial court also rejected an argument that Iannielli abandoned the prior nonconforming use. No appeal was taken.

Geneva initiated the current enforcement action in August 2004. Through its amended complaint, Geneva sought an injunction to bar Minsec from operating its community corrections center on the upper floors of the subject property. In count I of the amended complaint, Geneva alleged that Minsec's use of the subject property exceeded the scope of the nonconforming use approved by the trial court in the 2000 zoning case. Geneva averred Minsec's use of the subject property as a "correctional facility" violated Section 306 of the City of Scranton Zoning Ordinance (zoning ordinance). That Section defines permitted uses in the various zoning districts and does not permit a "correctional facility" in the C–D Business district in which the subject property lies. In count II of its amended complaint, Geneva averred Iannielli abandoned its nonconforming use for at least 12 months after the trial court's decision in the 2000 zoning case, and, therefore, the current use of the subject property was required to conform to the zoning regulations for the C–D Business district, which it presently does not.

Minsec and Iannielli filed preliminary objections to Geneva's amended complaint, arguing Geneva lacked standing to sue. Minsec and Iannielli also argued the trial court addressed the issue raised in Geneva's amended complaint in the 2000 zoning case in which the trial court determined Iannielli had a vested nonconforming right that runs with the land.

In 2005, the trial court sustained Minsec's preliminary objections to both counts and dismissed Geneva's suit. Geneva appealed to this Court.

On appeal, Geneva asserted the trial court erred in sustaining preliminary objections where Minsec's use of the subject property violated the zoning ordinance, and where the nonconforming use of the subject property authorized by the 2000 zoning case, was abandoned. In response, Minsec and Iannielli asserted Geneva lacked standing. They also argued the trial court previously decided the issues raised by Geneva in the 2000 zoning case, and the nonconforming use ultimately approved in that case runs with the land.

In November 2006, this Court issued an unreported decision in which we determined Geneva's amended complaint averred sufficient facts to state a claim under Section 617 of the MPC both as to standing and as to the merits. *See Geneva House, Inc. v. Minsec of Scranton, Inc.*, 911 A.2d 248 (Pa.Cmwlth.2006) (unreported) (*Geneva House I*). Thus, we reversed the trial court's order dismissing Geneva's amended complaint and remanded to allow the case to proceed.

After remand, Minsec and Iannielli filed an answer and new matter to Geneva's amended complaint. The case proceeded through a lengthy period of discovery.

In May 2010, Minsec filed a motion for summary judgment again arguing Geneva lacked standing under Section 617 of the MPC because it admitted it did not suffer any actual harm as a result of any alleged violation of the zoning ordinance occasioned by Minsec's facility. Minsec further asserted it was entitled to summary judgment because Geneva did not present any evidence that Minsec exceeded the legal use of the subject property. Minsec also maintained summary judgment was appropriate on count II of Geneva's amended complaint because Geneva's claim constituted an improper collateral

attack on the trial court's decision in the 2000 zoning case.

Ultimately, the trial court issued a decision granting Minsec's motion for summary judgment. Specifically, the trial court determined, despite years of discovery, Geneva was unable to articulate any substantial effect that Minsec's operations had or will have on Geneva. The trial court explained:

[Geneva's] unsubstantiated fear of the unknown and of what *might* happen due to [Minsec's] operations is no different than the concern that might be felt by other neighbors or the general public. The lack of a [Geneva]-specific affect [Minsec's] operations [sic] leaves this Court to find that [Geneva] does not possess the required standing to be an aggrieved party as contemplated under the [MPC].

Tr. Ct., Slip Op., 11/10/10, at 4 (emphasis in original). The trial court noted that, at deposition, Stephen Proctor, Geneva's corporate designee, admitted Minsec's facility did not have any particularized, harmful effect on Geneva's elderly residents. The trial court also stated Proctor admitted he had no evidence that Minsec operated anything other than the approved transitional housing facility or that Minsec exceeded the legal use of the subject property as determined by the trial court in the 2000 zoning case. Geneva again appeals to this Court.

## II. Discussion

With regard to the applicable standard and scope of review of a decision granting summary judgment, our Supreme Court explains:

This Court's scope of review of an order granting summary judgment is plenary. Our standard of review is clear: the trial court's order will be reversed only where it is established

that the court committed an error of law or clearly abused its discretion. Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party. When the facts are so clear that reasonable minds cannot differ, a trial court may properly enter summary judgment.

The function of the summary judgment proceedings is to avoid a useless trial but is not, and cannot, be used to provide for trial by affidavits or trial by depositions.... In considering a motion for summary judgment, the lower court must examine the whole record, including the pleadings, any depositions, any answers to interrogatories, admissions of record, if any, and any affidavits filed by the parties. From this thorough examination, the lower court will determine the question of whether there is a genuine issue as to any material fact. On this critical question, the party who brought the motion has the burden of proving that no genuine issue of fact exists. All doubts as to the existence of a genuine issue of a material fact are to be resolved against the granting of summary judgment.

*Stimmler v. Chestnut Hill Hosp.*, 602 Pa. 539, 553–54, 981 A.2d 145, 153–54 (2009) (citations and quotations omitted).

### A. Standing

Section 617 of the MPC, entitled "Causes of action," states, as relevant:

In case any building [or] structure ... is, or is proposed to be, erected, con-

structed, reconstructed, altered, converted, maintained or used in violation of any ordinance enacted under this act or prior enabling laws ... *any aggrieved owner or tenant of real property who shows that his property or person will be substantially affected by the alleged violation,* in addition to other remedies, may institute any appropriate action or proceeding to prevent, restrain, correct or abate such building [or] structure ... or to prevent, in or about such premises, any act, conduct, business or use constituting a violation. When any such action is instituted by a landowner or tenant, notice of that action shall be served upon the municipality at least 30 days prior to the time the action is begun by serving a copy of the complaint on the governing body of the municipality. No such action may be maintained until such notice has been given.

53 P.S. § 10617 (emphasis added).[4]

Geneva first argues the trial court erred in determining it was not an aggrieved party under the above-quoted Section. Geneva asserts that in *Siegmond v. Duschak*, 714 A.2d 489 (Pa.Cmwlth.1998), this Court specifically held that Section 617 of the MPC contains no language requiring a property owner establish that an ordinance violation resulted in an injury special and peculiar to his property. Rather, the plain language of the MPC requires only that a property owner be "substantially affected" by an ordinance violation in order to bring a cause of action.

Here, Geneva argues, at his deposition, Proctor indicated that 67 "frail older seniors" occupy Geneva's building, and it was their concerns that led Geneva to file suit.

Geneva asserts there were also concerns among its board members, who are responsible for administration of the facility, that an incident involving Minsec's alleged illegal use of the subject property could force the closure of Geneva's facility. Proctor further testified there were some incidents, although minor, that caused Geneva's board members to seek enforcement of the zoning ordinance. Proctor also testified the subject property is immediately adjacent to Geneva's facility. Additionally, Proctor indicated that the potential for harm by Minsec's residents caused Geneva's concerns for the safety of its residents.

Geneva also argues, although Minsec attempts to equate the MPC's "substantially affected" language with "actual harm," nothing in the statute or the case law supports such an interpretation. Geneva asserts Proctor was honest that no resident of Geneva's facility was murdered by a Minsec resident; however, Geneva's residents voiced concerns about safety.

Minsec responds the only private plaintiffs who have standing to bring suit under Section 617 are those who are "aggrieved" and "substantially affected" by a zoning violation. Minsec argues Section 617 and common law principles regarding standing require a plaintiff to suffer actual harm to establish standing. Minsec asserts unsubstantiated, subjective feelings of anxiety arising from an alleged zoning violation are insufficient to constitute the requisite harm.

Minsec further argues that Proctor, Geneva's corporate designee and chairman, testified Minsec's use of the subject property, which began over eight years ago,

---

4. In *Geneva House I*, this Court indicated that it was not entirely clear whether Geneva complied with Section 617's notice requirement. We stated: "This factual issue of whether notice was provided will need to be addressed prior to this case proceeding any further." *Id.,* Slip Op. at 5–6, n3. The parties do not discuss this issue here; however, it *does* appear Geneva complied with the notice requirement. *See* R.R. at 84a–85a.

has had no adverse effect on the desirability of Geneva's facility, and "[t]here has been no actual harm at this point." R.R. at 19a, Dep. of Stephen Proctor, Notes of Testimony (N.T.), 3/2/10, at 61. The only effects Proctor cited were "some minor things that happened on the street where people—I mean, we're not looking at somebody being mugged, but it was more, you know, fear of large tattooed folks who are hanging out at a place." R.R. at 15a, N.T. at 46.

Minsec maintains Section 617 of the MPC does not grant a plaintiff standing to sue based merely on subjective anxiety or fear. *See Geschwindt v. Wagner*, 1 A.3d 970 (Pa.Cmwlth.2010), *appeal denied*, ── Pa. ──, 19 A.3d 1052 (No. 578 MAL 2010, filed March 30, 2011) (mere physical proximity and aesthetic objections do not provide a basis for standing under Section 617). Minsec argues that, allowing plaintiffs to sue under Section 617 based solely on their subjective feelings of anxiety would give the statute's standing clause an unlimited scope.

As noted above, Section 617 of the MPC states that a private individual may file suit to "prevent, restrain, correct or abate" violations of zoning ordinances provided the "aggrieved owner or tenant of real property ... shows that his property *or person* will be *substantially affected* by the alleged violation...." 53 P.S. § 10617 (emphasis added).

In support of its assertions that it has standing under Section 617, Geneva relies on this Court's decision in *Siegmond*. A review of that decision is helpful. In *Siegmond*, two landowners constructed an addition on their garage in violation of the applicable zoning ordinance. Two objectors, who were adjacent landowners, brought suit seeking to enforce the ordinance. After a non-jury trial, the common pleas court entered an order enjoining the landowners from using the addition and requiring removal of the offending structure.

Before this Court, the landowners argued the common pleas court erred in determining the objectors had standing under Section 617. Specifically, they asserted an objective standard must apply in determining whether an individual is substantially affected by an alleged zoning ordinance violation, and the injuries resulting from the violation must be special and peculiar to the objector. The landowners argued the objectors did not meet this standard. Rejecting this argument, this Court explained:

> Section 617 of the MPC establishes a cause of action for any owner of real property who shows that his or her property or person will be substantially affected by the violation of an ordinance. The MPC contains no language requiring that the property owner establish that the violation of the ordinance resulted in an injury special and peculiar to his or her property.[FN3] It is well settled that plain words of a statute cannot be disregarded where the language is free and clear from ambiguity. *Commonwealth v. Hagan*, 539 Pa. 609, 654 A.2d 541 (1995). Accordingly, the MPC, clear on its face, requires only that a property owner be substantially affected by the ordinance violation in order to have a cause of action.

> FN3. This Court notes that *prior* to the reenactment and amendment of Section 617, case law required a property owner to establish that an ordinance violation had resulted in an injury special and peculiar to his or her property. We hold that this standard, however, is limited in application to the MPC as it existed *prior to* reenactment and amendment and *not* in its present form.

> The [landowners'] ordinance violation resulted in increased noise and activity, as well as a loss of privacy to the [ob-

jectors]. Such effects are sufficient to establish that the [objectors] were substantially affected by the ordinance violation.

*Id.* at 491 (underlined emphasis added).

Here, at the preliminary objection stage, this Court determined Geneva averred sufficient facts to establish standing. Specifically, in *Geneva House I*, we stated:

Geneva's concerns are consistent with [Section 617's] requirements, go directly to the "public health, welfare and safety of the community," and, particularly, *the safety of the senior citizen residents of its adjacent home.* Geneva has sufficiently averred that its "property ... will be substantially affected by the alleged violation," *by stating that its residents are at greater risk of harm caused by Minsec operating a private correctional facility either without express authorization or, alternatively, in excess of any authorization it may have.* Accordingly, we conclude that it has sufficient interest in the averred zoning violations to enable it to bring this private enforcement action.

*Geneva House I,* slip op. at 5 (emphasis added).

After our decision in *Geneva House I,* this case proceeded through discovery. On the issue of standing, in response to Minsec's interrogatories, Geneva averred, "Geneva House is an aggrieved landowner, in that the elderly and disabled residents of its building are substantially affected by the illegal presence of a non-secure, private prison facility just feet away from the high-rise in which they reside." R.R. at 77a.

Thereafter, at deposition, Proctor, Geneva's corporate designee and CEO of Geneva's parent corporation, testified regarding Geneva's standing to bring this enforcement action. Proctor testified Minsec's correctional facility is "immediately next door" to Geneva's property, which provides housing for low-income seniors. R.R. at 7a, 12a, 18a, N.T. at 15, 33, 59. Proctor further explained, at various meetings, Geneva's board members expressed surprise at the change in use of the subject property, which occurred when Minsec began operating the corrections center. R.R. at 14a, N.T. at 41. Proctor testified Geneva houses "67 frail old seniors," who voiced concerns about Minsec residents. *Id.;* R.R. at 16a, N.T. at 49–50. Proctor testified Geneva's primary concern is the safety of its residents, and if Geneva's residents do not feel secure, Geneva's operation would essentially be rendered valueless. R.R. at 18a, N.T. at 59–60. Proctor testified:

Our ability to attract people and the confidence that people have in placing their family members there depends on it being perceived and actually being a secure and safe environment. Without it being a safe environment, we wouldn't have any tenants. Without it being a place where you could trust your mom to be safe while you're at home, family members wouldn't place anyone there.

So the first thing is the perception of safety and the reality of safety. And the proximity of the property means that whatever happens in that building, if it's a change in use that makes this population feel or actually be less secure it could have a devastating impact on the people who live there and their mental status and our economic interest. The value of that property is only driven by the confidence of seniors to want to live there. If they don't—if they're fearful, the value of the property drops to nearly zero.

R.R. at 18a, N.T. at 60. Proctor further testified if an incident occurred in which a Minsec resident harmed a Geneva resident, it could force the closure of Geneva's

facility. R.R. at 14a, 26a, N.T. at 42, 89. Proctor also testified there was a general concern regarding Minsec's use of the subject property, and there were "probably some minor things that happened on the street...." R.R. at 15a, N.T. at 46.

■ When viewed in light of the summary judgment standard, the evidence presented by Geneva is sufficient to establish standing under Section 617. Specifically, Geneva presented evidence regarding its concerns over the safety of its residents, who live in a facility immediately adjacent to Minsec's correctional facility, and the potential financial impact on Geneva's facility. Qualitatively, safety is an express, state-mandated goal of zoning. *See* Section 604(1) of the MPC, 53 P.S. § 10604(1) (provisions of zoning ordinances shall be designed to promote, protect and facilitate any or all of the following, including public health, safety, morals, and the general welfare). Indeed, preservation of safety is among the highest objectives of zoning. *See* 1 Robert M. Anderson, Law of Zoning in Pennsylvania § 5.32 (1982 ed.).

The safety concerns here are objective in at least three ways. First, the concerns are reasonable in that the record fails to establish they arise from an idiosyncratic sensitivity. This is especially true given Minsec's use, which can be expected to have a different impact than many uses and, as explained below, is not a permitted use in the zone where it is located. Second, the concerns were manifested by concrete action, in this case by repeated complaints by Geneva residents and board members and by extensive litigation. Third, the concerns are supported by unquestioned adjacency and concomitant increased exposure.

That the objective safety concerns are not also accompanied by snatched purses, flashed weapons, bruised limbs or shouted threats does not compel a different result. This is because special injury is no longer a necessary precondition, *Siegmond,* and because the overarching purpose of the enforcement action here is to prevent such occurrences, not to react after the fact. *See Borough of Bradford Woods v. Platts,* 799 A.2d 984 (Pa.Cmwlth.2002) (purpose of enforcement of ordinance should be to ensure that health, safety, morals and general welfare of the community are protected).

The objective safety concerns, coupled with Geneva's assertions and evidence that Minsec is operating a community corrections facility either without express authorization, or in excess of any authorization it may have, are sufficient to show Geneva is substantially affected by the claimed violation of the zoning ordinance. Accordingly, we conclude the respected trial court erred in determining Geneva lacked standing at the summary judgment stage.

Moreover, our recent decision in *Geschwindt* does not command a different conclusion. There, two objectors filed an enforcement action alleging two nearby landowners built a garage in violation of applicable setback requirements and were also operating a business that did not qualify as a home occupation. After a non-jury trial, a common pleas court granted the landowners' motion for directed verdict, concluding the objectors did not prove they were substantially affected by the alleged unlawful uses.

On appeal by the objectors, this Court affirmed. We explained that mere proximity to an objectionable use, which is sufficient to show aggrievement to challenge the grant of a zoning permit,[5] is not, by

---

5. *See* Section 913.3 of the MPC, added by the     Act of December 21, 1988, P.L. 170, 53 P.S.

itself, sufficient to confer standing under Section 617 of the MPC. Specifically, Section 617 requires a party to show he was not only aggrieved, but also "substantially affected" by an alleged zoning violation. We determined the objectors offered only "bald assertions" rather than any actual proof that they were substantially affected by the alleged setback violations. *Id.* at 974. We further concluded the objectors' proximity (some 70 feet away) and aesthetic concerns were insufficient to satisfy the "substantially affected" standard. Additionally, this Court pointed out that no zoning violation was apparent given that the landowners had a permit for the garage and the zoning officer determined the landowners' home occupation was a "no impact home based business," which did not amount to a zoning violation. *Id.* at 976.

*Geschwindt* is distinguishable for numerous reasons. Procedurally, the *Geschwindt* objectors were allowed to proceed to trial to make their proofs; however, that opportunity was foreclosed for Geneva. As a result, our manner of review is different. Substantively, the *Geschwindt* objectors raised aesthetic concerns rather than the objective safety concerns raised here. Further, the uses are significantly different. In other words, the expected impact of a home-based business is not comparable to that of a community corrections center for up to 20 state parolees or persons under the jurisdiction of the Department of Corrections (DOC), Bureau of Community Corrections. Also, unlike in *Geschwindt,* and as set forth more fully below, a substantial question exists here as to whether Minsec's operation of its community corrections center is a lawful use.[6]

§ 10913.3.

**6.** As a final point, none of the other cases cited by Minsec involved a question of standing to bring an enforcement action under

## B. Merits

Because the trial court determined Geneva lacked standing, it did not address the merits of Geneva's enforcement action. Based on our determination that Geneva has standing, an examination of the merits is appropriate.

As to the merits, Geneva argues Minsec is violating the zoning ordinance by operating an illegal prison facility within feet of Geneva's property.

Geneva provides the following background to Minsec's alleged violation. In 2000, Diversified sought zoning relief for its proposed facility on the subject property, which ultimately resulted in the trial court approving the use of the subject property as a transitional living facility.

Prior to Diversified's request, the upper floors of the subject property were used for a transitional living program for MH/MR residents. R.R. at 96a–97a. Diversified then applied for a special exception "to expand an existing use." According to the trial court's 2000 opinion, Diversified presented testimony before the ZHB that the use of the facility was as a "specialized living facility" for up to 15 persons per floor with addiction problems. R.R. at 91a. Diversified represented, "[a]ll patients will be local residents, and there will be no importation of patients from Philadelphia or outside of the Wyoming Valley." *Id.* Diversified indicated the subject property would be used by the judicial system to refer persons for a 90–day monitoring period to "give the local judiciary alternatives for dealing with offenders after they finish detoxification." *Id.* Geneva asserts this is

Section 617 of the MPC; as such, these cases are not as helpful in resolving the issue presented.

an obvious reference to local, pre-trial diversion of drug offenders, not criminals sentenced to "state time," which Minsec now houses. Additionally, Diversified represented "[t]here will be no violent offenders, sex offenders, or pedophiles at its transitional living facility." *Id.*

Geneva asserts Minsec's current use of the subject property is far different from the use proposed by Diversified. It argues that Minsec now operates a prison under a contract with the DOC, which accepts "inmates referred by [DOC] ... as well as the Pennsylvania Board of Probation and Parole into its residential program." R.R. at 121a. Geneva contends there is no mention of "patients" in the contract. Geneva further asserts the services Minsec agreed to perform for DOC include individual and group counseling in areas of substance abuse, stress/conflict and anger management and dealing with authority and aggression. Geneva asserts these services are very different from housing and counseling patients with drug or substance abuse problems.

Geneva also points out Diversified's application to the ZHB in 2000 did not name Geneva as an adjoining property owner, despite the fact the two properties share a lengthy common line, and Geneva is one of only two immediately adjoining property owners. Geneva asserts it was not involved in the prior ZHB hearing because it did not receive notice of Diversified's application.

Geneva also points out that an April 2002 building permit application, which sought permission to make alterations to the subject property for a "rooming house," was filed in the name of "Sheeley's Drug Store." R.R. at 207a–08a. Geneva asserts this building permit did not give Minsec the right to operate anything, let alone a prison. Also, Geneva notes, in December 2002, the City issued a certificate of occupancy for the subject property to "Dan Iannelli" for the "Specific Uses of Structure" as "Bldg." R.R. at 209a. It asserts that certificate did not give Minsec the right to operate anything, let alone a prison.

Geneva contends the current zoning ordinance does not permit Minsec's use of the subject property as a private correctional facility, and Minsec did not seek a variance for such use. Geneva also argues the current use of the subject property contravenes what was presented in connection with the 2000 zoning case. To that end, Geneva asserts, in response to discovery requests, Minsec admitted it houses violent offenders at the subject property, which clearly violates the trial court's order in the 2000 zoning case.

Minsec counters that there is no record evidence that supports Geneva's assertions that Minsec exceeded the nonconforming use of the subject property or that Minsec abandoned that use.

In connection with Geneva's first claim, Minsec argues, it served Geneva with an interrogatory, in which Minsec requested that Geneva "describe the facts and circumstances which support your allegations ... that the use which Minsec is operating at the [subject] property is not the expanded nonconforming use" the trial court recognized in 2000. R.R. at 66a. Geneva responded, in pertinent part: "Minsec is operating a private correctional facility with no restrictions on residents. Minsec is housing individuals from Philadelphia or outside the Wyoming Valley and 'violent offenders, sex offenders, or pedophiles.'" *Id.* at 79a. However, Minsec asserts when it questioned Geneva's corporate designee on these statements at deposition, he admitted he lacked personal knowledge of the precise nature of Minsec's facility or the residents it houses.

Despite this testimony, Minsec argues, Geneva cites various documents that allegedly support its claim that Minsec exceeded its authorized nonconforming use. However, Minsec asserts, none of these documents show Minsec's use conflicts with or exceeds the use approved in the 2000 zoning case.

Minsec also takes issues with the evidence Geneva cites in support of its claim that the prior nonconforming use of the subject property was abandoned. Additionally, Minsec argues, a party claiming abandonment of a nonconforming use is required to show intent to abandon the use, and Geneva presented no such evidence.

■ Upon review, we conclude genuine issues of material fact exist as to whether Minsec's current use of the subject property violates the zoning ordinance, which preclude summary judgment on the merits.

As to the applicable provisions of the zoning ordinance, Section 306 states that a "treatment center," which includes a "criminal half-way house/ criminal transitional living facility," is *not* permitted in the C–D Business district in which the subject property lies. *Id.;* Section 202 of the zoning ordinance. Additionally, although the zoning ordinance permits "expansion of a county-owned correctional facility" by special exception in the C–D Business district, it makes no provision for a privately-owned or state correctional facility.[7] Thus, regardless of whether Minsec's community corrections center is classified as a "treatment center" or a "correctional facility," it is not permitted in the C–D Business district. As a result,

the issue is whether Minsec's community corrections center qualifies as a continuation of the previously approved nonconforming use of the subject property.

As explained above, in the 2000 zoning case, Diversified sought a special exception to house individuals with drug or substance abuse problems at the subject property. After hearing, the ZHB denied Diversified's application. Diversified appealed to the trial court. The trial court determined the prior use of the subject property as a "transitional living facility" for MH/MR individuals was sufficiently similar to the proposed "transitional living facility" for individuals with drug or substance abuse problems so as to constitute the continuation of a nonconforming use.

Approximately two years later, Minsec began operating its community corrections center without first seeking zoning approval. Pursuant to Section 806(G) of the zoning ordinance, a change from one nonconforming use to another nonconforming use requires special exception approval after a ZHB hearing. In evaluating such a request, the ZHB must determine whether the applicant provided sufficient proof to show the proposed new use "will be equally or less objectionable in external effects compared to the pre-existing nonconforming use." Section 806(G)(2) of the zoning ordinance. Further, the ZHB is to consider, among other things, the compatibility of the proposed use with the character of the surrounding area. Section 806(G)(2)(e) of the zoning ordinance. In *Geneva House I,* we stated that, based on these provisions, the similarity of Minsec's current use of the subject property with the vested nonconforming use needed to be developed

---

**7.** The zoning ordinance defines a "correctional facility" as "[a] facility operated by the County of Lackawanna, the Commonwealth of Pennsylvania or the U.S. Government to incarcerate persons who have been sentenced by a court of law or a parole board to involuntarily spend time in such facility, or who are being incarcerated while awaiting trial or sentencing. See also [']Treatment Center.[']." Section 202 of the zoning ordinance.

at a public hearing before the ZHB on an application for special exception. There is still no indication Minsec sought a special exception. Minsec's failure to seek approval deprived the ZHB and the public of the right to fully consider the change in use.

Reviewing the record in a light most favorable to Geneva, as we must at this stage, factual issues exist as to whether Minsec's use of the subject property constitutes a continuation of a prior nonconforming use.

Specifically, in the 2000 zoning case, the trial court determined the nonconforming use of the subject property was a "transitional living space" for individuals with addiction problems. R.R. at 97a. At that time, Diversified represented that all patients would be local residents and there would be no importation of residents from Philadelphia or outside the Wyoming Valley. In addition, it was contemplated the prior facility would not house violent offenders, sex offenders or pedophiles. R.R. at 91a.

Contrary to these prior representations, the record contains Minsec's service contract with DOC, which indicates Minsec agreed to provide, "room and board, treatment services, inmate/parolee monitoring ... [for] [p]ersons who will either currently be on state parole and experiencing difficulties maintaining their status in the community or be on pre-release status under the jurisdiction of [DOC], Bureau of Community Corrections, or be referred as a parolee from a State Correctional Institution under the jurisdiction of the Pennsylvania Board of Probation and Parole." R.R. at 117a. Based on our review of the record, a factual issue exists as to whether the individuals Minsec houses at its community corrections center are within the parameters represented by Diversified in obtaining approval to continue the prior nonconforming use. *See, e.g.,* R.R. at 147a–64a (Minsec's proposal for community corrections center).

Further, although Minsec points to Proctor's testimony that he lacked personal knowledge as to the types of offenders housed by Minsec, in a discovery response, Minsec indicated, "the facility is not intended to house violent offenders, *although there may be circumstances where a resident has crimes of violence in the past.*" R.R. at 211a (emphasis added).

■ Additionally, the parties disagree over the import of evidence that purportedly shows abandonment of the prior nonconforming use of the subject property. The issue of abandonment of a nonconforming use is "*a question of fact* that depends upon all the factors present in the case." *Finn v. Zoning Hearing Bd. of Beaver Borough,* 869 A.2d 1124, 1127 (Pa. Cmwlth.2005) (citing *Kuhl v. Zoning Hearing Bd. of Greene Twp.,* 52 Pa. Cmwlth. 249, 415 A.2d 954 (1980)). Because there are disputed factual issues as to whether the prior nonconforming use of the subject property was abandoned, summary judgment is not proper.

In short, factual issues exist regarding whether Minsec substantially changed the previously approved nonconforming use of the subject property without the required zoning approval and whether any nonconforming use of the subject property was abandoned. As such, entry of summary judgment on the merits is precluded.

Based on the foregoing, we reverse and remand this case for further proceedings.

Judge McCULLOUGH dissents.

### ORDER

**AND NOW,** this 1st day of July, 2011, the order of the Court of Common Pleas of Lackawanna County is **REVERSED,** and

the case is **REMANDED** for further proceedings.

Jurisdiction is relinquished.