Commonwealth of Pennsylvania, Plaintiff *v.* Diamond Shamrock Chemical Company, a unit of Diamond Shamrock Corporation, Defendant.

Argued June 6, 1978, before President Judge Bow-
man and Judges Crumlish, Jr., Wilkinson, Jr., Men-
cer, Rogers, Blatt and DiSalle.

*G. Alan Kramer,* Deputy Attorney General, with
him *J. Justin Blewitt, Jr.,* Deputy Attorney General,
and *Robert P. Kane,* Attorney General, for plaintiff.

*Roger T. Shoop,* with him *James K. Thomas,* and
*Thomas & Thomas,* for defendant.

Opinion by President Judge Bowman, October 11,
1978:

This is an assumpsit action filed within our origi-
nal jurisdiction by the Commonwealth of Pennsyl-
vania (Commonwealth) against Diamond Shamrock
Chemical Company (Diamond). Presently before us
are (1) the Commonwealth's application for leave to
file answer nunc pro tunc to Diamond's request for
admissions and (2) Diamond's motion for summary
judgment.

On January 20, 1976, the Commonwealth filed its
complaint in assumpsit, the essential allegations of
which are as follows: On or about November 15, 1973,
the Commonwealth and Diamond entered into a writ-

ten contract whereby Diamond agreed to sell and deliver to the Commonwealth its requirements for pesticides Amine 2D/2T and Amine 4D for the period beginning January 1, 1974 and ending December 31, 1974. On April 3, 1974, Diamond informed the Commonwealth that it would be unable to produce either Amine 2D/2T or Amine 4D; that it would be unable to supply any of the Amine 2D/2T requirements; and that it possessed a sufficient quantity of Amine 4D to supply up to the contract's estimated quantity, but could not supply any requirements beyond that figure.[1] It is alleged that Diamond subsequently delivered 4020 gallons of Amine 4D, the Commonwealth's good faith requirements having been 7020 gallons. It is alleged that Diamond delivered no Amine 2D/2T, the Commonwealth's good faith requirements having been 9450 gallons. Finally, the Commonwealth alleges that it purchased the needed quantities of these pesticides "in the open market at a cost of $95,121.00 or $40,-185.50 in excess of the price called for by the contract. . . ." The Commonwealth demands judgment against Diamond in the sum of $40,185.50 plus interest.

By way of answer, filed March 1, 1976,[2] Diamond admits that it supplied the Commonwealth with no Amine 2D/2T and with only 4020 gallons of Amine 4D. It denies, however, the Commonwealth's allega-

---

[1] The contract contains the following provision:

It shall be understood and agreed that quantities designated in the proposal are estimated only and may be increased or decreased in accordance with the actual normal requirements of the Commonwealth and that the Commonwealth in accepting any bid or portion thereof, contracts only and agrees to purchase only the quantities as represent the actual requirements of the Commonwealth.

[2] It had been stipulated between counsel on February 11, 1976, that Diamond had until March 1, 1976, to answer or otherwise plead to the Commonwealth's complaint.

tions regarding good faith requirements or open market purchase price. *See* Pa. R.C.P. No. 1029(c). Under new matter, Diamond asserts the following:

On February 24, 1974, the E. I. DuPont facility at Beaumont, Texas, was accidentally and unexpectedly shut down. This plant was the chemical industry's major source of methanol, an essential element in the production of dimethylamine. Without dimethylamine, the Defendant could not produce Amine D. Without triethylamine [which Diamond alleges it was unable to obtain because of a severe depletion of the production of ethylene (which is necessary to produce triethylamine) occasioned by certain directives of the Federal Energy Office to petroleum producers during the Arab oil embargo], the Defendant could not produce Amine T; and, without Amine D and Amine T, the Defendant could not produce Amine 2D/2T as required by the contract with the plaintiff.

The Commonwealth filed its reply to new matter on March 8, 1976.

Examination of the file in this case reveals that by letter of December 1, 1976, the Chief Clerk of this Court notified the Commonwealth that unless action was taken on this case within twenty days, a rule to show cause why the case should not be dismissed for want of prosecution would be issued. On May 11, 1977, the Court issued such rule against the Commonwealth. On May 26, 1977, upon consideration of the Commonwealth's response to said rule, an Order was entered discharging the rule.

On May 27, 1977, Diamond filed and served on the Commonwealth, pursuant to Pa. R.C.P. No. 4014, a request for admissions as to certain facts, and on June 21, 1977, no response by the Commonwealth

having been made, Diamond filed its motion for summary judgment.

Response of the Commonwealth to Diamond's request for admissions was first attempted on November 25, 1977, when the Commonwealth filed an application for leave to respond nunc pro tunc to said request. We directed that this application be listed for argument at the same time as argument on Diamond's motion for summary judgment, which was then scheduled for December 5, 1977.[3]

*Commonwealth's Application for Leave to Respond Nunc Pro Tunc to Diamond's Request for Admissions*

Noting that "[t]here is no dispute that Pa. R.C.P. No. 4014 . . . imposes a duty to respond within ten days of the request," and conceding its failure so to do, the Commonwealth requests this Court to exercise our discretion and permit it to respond nunc pro tunc since there is "no indication of bad faith on the part of plaintiff and no prejudice to defendant." The Commonwealth attributes its failure to respond to the request for admissions within ten days to the heavy case load of the Department of Justice Collections Division which was handling this case; the serious understaffing of the Collection Division "insofar as it lacked attorneys, with the exception of the Chief Counsel, experienced or competent in the handling of matters involving the complexities of the Pennsylvania Rules of Procedure;" the turnover of Commonwealth attorneys responsible for prosecuting this case; and finally, a "clerical error" resulting in the request being placed directly in the file by the clerical staff.

---

[3] The December 5, 1977 argument was continued because counsel for plaintiff was hospitalized. Argument was rescheduled to March 3, 1978, but again continued because of plaintiff's counsel's involvement in an automobile accident. Argument was rescheduled for June 6, 1978.

Our research has not disclosed any case law addressing specifically the circumstances under which a nunc pro tunc application to respond to a Rule 4014 request for admissions may be granted. It is clear, however, that the purpose of the procedure set forth in Pa. R.C.P. No. 4014 is to clarify issues raised in prior pleadings with the goal of expediting the litigation process. We believe, therefore, that if compelling reasons can be established by the moving party for its failure to timely respond and no prejudice results to the adverse party, a nunc pro tunc application should be granted.

The reasons alleged by the Commonwealth for its failure to timely respond, while regrettable, are not compelling. Indeed, were we to find them compelling, we can conceive of few sets of circumstances which could ever be deemed noncompelling. Weight of case load is not a compelling reason; nor is the dearth of counsel competent to handle matters involving the complexities of a rule providing that unless a response is filed within ten days, the matter of which an admission is requested is deemed admitted. Transfer of a file from one attorney to another is not a compelling reason. And assuming a "clerical error" resulted in the document initially being placed unnoticed into the file, the fact that it remained unnoticed for nearly five months renders this a noncompelling reason as well.

The granting of the Commonwealth's application, moreover, cannot be viewed as without prejudicial impact upon Diamond. After Diamond properly exercised its right to file for summary judgment on June 21, 1977, this case was listed for argument on the summary judgment motion. Relying to a substantial degree upon the Commonwealth's admissions, Diamond prepared its brief in support of its motion and filed that brief in this Court on November 4, 1977. The Commonwealth's nunc pro tunc application was

not filed until November 25, 1977, three weeks after Diamond's brief was filed. Given this sequence of events, we do not agree with the Commonwealth's contention that Diamond will not be prejudiced by a nunc pro tunc Commonwealth response.

### Diamond's Motion for Summary Judgment

Our role when presented with a motion for summary judgment is clear. Pa. R.C.P. No. 1035(b) provides that "[t]he judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "[A] summary judgment may be granted if the moving party shows that there is no genuine issue as to any material fact, and the record, viewed most favorabl[y] to the nonmoving party, reveals that the moving party is entitled to judgment as a matter of law." *Dowlin v. Coatesville Area School District*, 22 Pa. Commonwealth Ct. 433, 436, 350 A.2d 190, 192 (1975).

Before reaching the merits of Diamond's motion, it must first be resolved what documents are properly before us for consideration. There is no doubt that we must examine the complaint, the answer with new matter, and the reply thereto. There is also no doubt that we must accept as true the *facts* admitted by the Commonwealth through its failure to respond to Diamond's request for admissions. Since, however, *conclusions of law* are not within the permissible scope of requests for admissions under Pa. R.C.P. No. 4014, those statements in Diamond's request for admissions which constitute conclusions of law are not properly before us.[4] Finally, three affidavits have been filed,

---

[4] We note that certain of the requests for admissions constitute mixed averments of fact and conclusions of law.

two by the Commonwealth and one by Diamond. The Commonwealth's first affidavit, that of one Robert S. Weis, manufacturing manager of DuPont's Acid Products Division, Industrial Chemicals Department, was filed December 23, 1977. Diamond's affidavit, that of one J.A. Ignatoski, division technical manager of Diamond's Agricultural Chemicals Division, was filed on April 26, 1978. The Commonwealth's second affidavit, also of Robert S. Weis, was filed June 5, 1978, one day prior to oral argument. At argument, we raised the question whether there exists some time frame in the summary judgment process which dictates a proper and improper time for the filing of affidavits. More precisely, is there a cutoff point in the summary judgment process after which affidavits may no longer be filed?

Examination of the provisions of Pa. R.C.P. No. 1035 unfortunately affords no definitive answer to this question. Subsection (a) of Rule 1035 provides: "After the pleadings are closed, but within such time as not to delay trial, *any party may move for summary judgment on* the pleadings, depositions, answers to interrogatories, admissions on file and *supporting affidavits, if any.*" (Emphasis added.) There would appear to be an implication in the above emphasized language that if the motion for summary judgment is to be based in part on supporting affidavits, those supporting affidavits should be part of the record at the time the motion is filed or made part of the record concurrent with the filing of the motion. It does not seem unreasonable to require the moving party to have developed a factual record which it deems sufficient to support its motion at the time the motion is filed. This conclusion with respect to supporting affidavits is also that of commentators on the Pennsylvania Rules of Civil Procedure. "If affidavits are to be used to supplement the matter already of record,

they will be attached to the motion or filed of record simultaneously with it." 2 Goodrich-Amram 2d §1035 (a) :4. *See also* 2B Anderson Pa. Civ. Prac. §1035.23 (f).

Faced with a motion for summary judgment, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Pa. R.C.P. No. 1035(d). Subsection (b) of Pa. R.C.P. No. 1035 provides that "[t]he adverse party, prior to the day of hearing, may serve opposing affidavits." Thus, the Rules expressly provide the adverse party an opportunity to file opposing affidavits on or before the day prior to hearing on the motion.

There is further provision in Pa. R.C.P. No. 1035 relating to the filing of affidavits. Subsection (d) states, *inter alia*: "The court *may permit* affidavits to be supplemented or opposed by depositions, answers to interrogatories, or *further affidavits*." (Emphasis added.) The use of the words "may permit" in this subsection clearly indicates that it is within the court's discretion to determine whether filing of "further affidavits"—that is, affidavits in addition to the initial supporting and opposing affidavits—shall be permitted.

This case is somewhat unusual in that Diamond apparently was content to rest on the factual record as embodied in the pleadings and the facts admitted by the Commonwealth through its failure to answer Diamond's request for admissions *until* the Commonwealth filed an opposing affidavit on December 23, 1977. Some four months thereafter Diamond submitted, for the first time, an affidavit. Query: May an affidavit not filed until four months after an opposing affidavit properly be considered a supporting affidavit, which Diamond may file as a matter of right? Or is it a "further affidavit" opposing the Commonwealth's opposing affidavit, which requires Court ap-

proval to file? Five weeks after Diamond's affidavit, the Commonwealth filed its second affidavit, in an attempt to controvert certain factual representations in Diamond's affidavit. Query: Is this an "opposing affidavit" which the Commonwealth had a right to file? Or is it a "further affidavit" supplementing its prior opposing affidavit, which the Commonwealth should have sought permission to file?

Without directly passing upon the above questions, we shall exercise the discretion accorded us by Pa. R.C.P. No. 1035(d) and consider both Commonwealth affidavits and Diamond's affidavit to be part of the factual record for purposes of this summary judgment motion. It is to be noted, however, that the summary judgment process is not intended to be a battle by affidavit.

We turn finally to the merits of Diamond's motion for summary judgment. Diamond argues that the present factual record establishes, as a matter of law, that it is excused from performance of its contractual obligations with the Commonwealth under the doctrine of commercial impracticability set forth in Article 2, Section 615 of the Uniform Commercial Code (Code), Act of April 6, 1953, P.L. 3, 12A P.S. §2-615. Section 2-615 of the Code provides:

> Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
>
> (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any

applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer. (Footnote omitted.)

Diamond points to the occurrence of three contingencies, the nonoccurrence of each being a basic assumption on which its contract with the Commonwealth was made: (1) the February, 1974 fire necessitating the shutdown of DuPont's Beaumont, Texas, methanol facility; (2) DuPont's resultant decision to allocate its remaining supplies of methanol only to companies who had been direct purchasers of methanol from DuPont during the previous year of 1973; and (3) the effect of the Arab oil embargo on the availability of ethylene. Diamond recognizes, and our research confirms, that this case is one of first impression in Pennsylvania courts under Section 2-615 of the Code.[5] However, after careful examination of

---

[5] Section 2-615 did receive brief attention in *Campbell v. Hostetter Farms, Inc.*,      Pa. Superior Ct.    , 380 A.2d 463 (1977), where appellee had, at trial, relied upon Section 2-615, asserting that unseasonably wet weather excused his nondelivery of corn and wheat to appellant. On appeal, appellant argued, *inter alia*,

Section 2-615, the Comments thereto, and the cited case law from other jurisdictions, and upon consideration of the factual record before us, we believe that the Commonwealth has demonstrated that there exist genuine issues for trial, and, accordingly, we shall deny Diamond's motion for summary judgment.

The crux of Diamond's defense is that the combined occurrence of the above named contingencies operated to render Diamond unable to procure certain chemicals necessary for its production of Amine D and Amine 2D/2T. Focusing specifically on but one of those chemicals, methanol, Diamond's position, through allegations in new matter and representations in its request for admissions, is that after the February, 1974 fire, DuPont allocated its supply of methanol to purchasers who had purchased from DuPont during 1973; that Diamond "had not been a direct purchaser of methanol from DuPont during 1973"; and that, therefore, Diamond "was ineligible for an allocation of DuPont's existing supply of methanol" after the fire. The December 23, 1977 affidavit of Robert S. Weis, submitted by the Commonwealth, however, specifically places these factual representations in issue. Weis, who during 1973 and 1974 was employed by DuPont as "Methanol Marketing Product Manager" charged with "the direct responsibility for all marketing of Methanol" has deposed that "Diamond was a customer of DuPont during the year 1973 during which time it was supplied [with] substantial quantities of Methanol via a pipeline from DuPont's Belle, West Virginia Plant"; that during 1973 Diamond purchased 5.2 million gallons of methanol from DuPont in this manner; that Diamond "continued to be a Methanol customer of DuPont throughout the

that the jury should not have accepted appellee's testimony that weather conditions "made complete performance impossible," which argument the Court summarily rejected. *Id.* at     , 380 A.2d at 467.

year 1974 during which period they were supplied [with] 4.6 million gallons of Methanol in the same manner it was supplied in 1973"; that, as a result of the fire and shutdown at Beaumont "all existing Methanol customers, including Diamond were placed upon an allocation based upon a percentage of prior purchases." Certainly, through this affidavit, the Commonwealth has set forth specific facts showing there is at least one issue for trial.

We deny Diamond's motion for summary judgment.

### ORDER

Now, October 11, 1978, the Commonwealth's application for leave to respond nunc pro tunc to Diamond Shamrock Chemical Company's request for admissions is hereby denied. The motion for summary judgment of Diamond Shamrock Chemical Company is hereby denied.