Johanna **FLETCHER,** Administratrix
of the Estate of Timothy
Fletcher, Petitioner

v.

**PENNSYLVANIA PROPERTY & CASUALTY INSURANCE GUARANTY ASSOCIATION** and **Commonwealth of Pennsylvania, Medical Care Availability and Reduction of Error Fund,** Respondents.

Commonwealth Court of Pennsylvania.

Argued Oct. 13, 2010.
Decided Aug. 26, 2011.

Daniel L. Thistle, Philadelphia, for petitioner.

Tawny Kay Mummah, Harrisburg, for respondents.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge LEAVITT.

Johanna Fletcher, administratrix of the estate of Timothy Fletcher (Decedent), seeks payment from the Medical Care Availability and Reduction of Error Fund (MCARE) on a medical malpractice verdict entered in favor of Decedent.[1] Fletcher has filed a declaratory judgment action in this Court's original jurisdiction to have the MCARE Fund held liable for the excess portion of that verdict of $7,727,808.20. Concluding that the MCARE Fund has liability to provide excess coverage on behalf of the physicians who committed the malpractice to the extent the malpractice "occurred" between

1997 and 2001, we grant partial summary judgment to Fletcher.

On December 13, 2002, Fletcher instituted a tort action against several defendants, including, *inter alia,* Dr. Solomon Kominsky and Dr. Thomas Kubacki and their practice, Kominsky Kubacki Medical Associates, Ltd. (Medical Associates).[2] Fletcher alleged that Decedent's death on February 9, 2001, was caused by the medical malpractice of Drs. Kominsky and Kubacki that extended over a ten-year period of time. Dr. Kominsky died in 1998, and Dr. Kubacki died in 2001. Accordingly, Fletcher's complaint named the estates of Drs. Kominsky and Kubacki.

The malpractice complaint alleged that Decedent began treatment at Medical Associates on January 9, 1991, which lasted until January 8, 2001. Fletcher Brief, Exhibit G, Malpractice Complaint, at ¶ 10 (hereinafter "Malpractice Complaint, ¶ ___"). Decedent was seen 98 times. Decedent's blood tests in 1991 revealed a cholesterol level of 381 and triglycerides of 760. His liver function studies showed an abnormality due to a fatty liver on the basis of obesity and hyperlipidemia. A gastroenterologist was consulted, who recommended a cardiology consult. However, Dr. Kominsky never followed up on this recommendation for Claimant.

In 1992, Decedent underwent further testing. At that time his blood sugar was high. In 1994, Decedent's cholesterol tested at 481, his triglycerides at 1,991 and his blood sugar at 167. Decedent reported a family history of diabetes and coronary artery disease to his physicians.

---

**1.** The Act of March 20, 2002, P.L. 154, *as amended,* 40 P.S. §§ 1303.101–1303.910, created the MCARE Fund as a statutory insurer providing medical malpractice coverage in excess of the primary layer of coverage purchased by the health care physician or hospital. The MCARE Fund replaced the Medical Professional Catastrophe Loss Fund (CAT Fund). 40 P.S. § 1303.712(a) and (b).

**2.** The complaint also named William H. Simon, D.O., and Frankford Hospital–Torresdale as defendants.

In 2000, Decedent began to experience severe fatigue and right shoulder and arm pain, which he reported to a doctor at Medical Associates. Malpractice Complaint, ¶ 15. No tests were done. Decedent was not treated for diabetes or elevated cholesterol. Instead, he was given the drug Phentermine, which is contraindicated for patients with cardiovascular disease.

On January 27, 2001, Decedent was admitted to the hospital in respiratory distress, where he remained until his death by heart attack 12 days later. At autopsy revealed a severe three-vessel coronary artery disease and middle and lower lobe pneumonia.

The malpractice complaint alleged that the doctors at Medical Associates caused Decedent's death by, *inter alia,* failing to treat his diabetes, high cholesterol and liver disease; by prescribing Phentermine; and by failing to order a cardiac consultation.

On November 11, 2005, a jury awarded $7 million in damages to Fletcher. After the trial court molded the verdict to include delay damages, the judgment against the estates of Dr. Kominsky and Dr. Kubacki and Medical Associates totaled $7,727,808.20.

PHICO Insurance Company issued a policy of medical malpractice insurance covering Dr. Kubacki and Medical Associates for five successive years: 1997 through 2001.[3] The policy provided coverage in the amount of $500,000 per incident of malpractice up to an aggregate $1,500,000. The MCARE Fund provided coverage excess of the PHICO policy in the amount of $1.2 million. In January of 2002, PHICO was placed into liquidation, making the Pennsylvania Property and Casualty Insurance Guaranty Association (Guaranty Association) liable for PHICO claims up to a maximum of $300,000 per claim.[4]

On April 7, 2006, Fletcher filed a declaratory judgment action, seeking to have this Court order MCARE and the Guaranty Association to pay Decedent's estate its respective portion of the final judgment. Specifically, Fletcher asserted that the Guaranty Association was obligated to pay $300,000 and delay damages on behalf of each defendant in the malpractice action. With respect to MCARE, Fletcher sought payment of $1.2 million and delay damages for Dr. Kubacki and for Dr. Kominsky. Sometime after the complaint was filed, the Guaranty Association and Fletcher resolved their dispute, leaving only MCARE in the case.

MCARE filed preliminary objections to Fletcher's complaint, asserting that this Court lacked jurisdiction. *Fletcher v. Pennsylvania Property & Casualty Insurance Guaranty Association (Fletcher I),* 914 A.2d 477, 479 (Pa.Cmwlth.2007). This Court overruled the preliminary objections and, thereafter, certified the jurisdictional question for an interlocutory appeal. The Supreme Court affirmed and remanded the matter to us for further proceedings. *Fletcher v. Pennsylvania Property & Ca-*

---

**3.** It appears that Dr. Kominsky and Dr. Kubacki each had claims-made coverage from PHICO from 1991 through their respective ending dates. *See* MCARE Letter to trial court, MCARE Brief, Exhibit A. MCARE had no records of the practice, Medical Associates, reporting coverage from 1991 through 1995. *Id.* Medical Associates did have PHICO claims-made coverage from January 1, 1996, through January 1, 2001. Fletcher's Brief, Exhibit 1.

**4.** The Guaranty Association was created by the Act of December 12, 1994, P.L. 1005, *as amended,* 40 P.S. §§ 991.1801–991.1802, and steps into the shoes of the insolvent insurer with respect to outstanding claims.

*sualty Insurance Guaranty Association (Fletcher II)*, 603 Pa. 452, 481, 985 A.2d 678, 697 (2009).

■ After the remand, MCARE filed an answer and new matter, asserting that it was not responsible to Fletcher for two reasons. First, each of the PHICO policies covering the malpractice defendants was a claims-made policy that had expired before Fletcher filed her medical malpractice lawsuit.[5] Further, not one of the PHICO policies had an extended reporting endorsement to cover claims filed after the policy's expiration.[6] Absent a primary policy of medical malpractice insurance to cover the malpractice of the defendants, the MCARE Fund has no liability for their excess coverage. Second, MCARE asserted that it did not receive a surcharge payment from PHICO or from any other primary insurer on an extended reporting endorsement. Absent the payment of the requisite surcharge, MCARE does not owe excess coverage on the medical defendants to Fletcher's action.

Fletcher filed a motion for summary judgment.[7] Fletcher asserts that Dr. Kubacki and his practice were fully insured by PHICO from January 1, 1997, through January 1, 2001, under a claims-made policy.[8] The PHICO policy provided that any physician who remained continuously insured by PHICO for at least four successive years would automatically receive an extended reporting endorsement, or tail coverage, without the payment of any additional premium. Since Dr. Kubacki was insured for four years by PHICO, 1997 through 2000, when he retired, PHICO automatically provided him tail coverage without the need for payment of additional premium. Medical Associates was likewise provided tail coverage because it was insured by PHICO for five years. The tail coverage converted the policy into an occurrence-type policy, making PHICO obligated to pay claims that arose between 1997 and 2001 but were not presented until after the 2000 policy expired in 2001. In addition, Dr. Kubacki and his practice paid

5. "A claims made policy provides coverage for claims filed while the doctor holds the policy, in contrast to an occurrence policy, which covers claims relating to any acts that occurred while the doctor held the policy, regardless of when the claims were filed." *Fletcher II*, 603 Pa. at 455 n. 4, 985 A.2d at 680 n. 4.

6. *See Fletcher II*, 603 Pa. at 456 n. 6, 985 A.2d at 681 n. 6 (noting that tail coverage converts a claims-made policy into an occurrence-type policy).

7. In a response to a motion for summary judgment, "the adverse party may not rest upon the mere allegations or denials of the pleadings." Pa. R.C.P. No. 1035.3(a). The adverse party must identify a dispute as to the evidence presented in the record, a challenge to the credibility of a witness or "evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced." Pa. R.C.P. No. 1035.3(a)(2). We may grant a motion for summary judgment in whole or in

part "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report...." Pa. R.C.P. No. 1035.2.

8. Fletcher's position with respect to MCARE coverage for Dr. Kominsky's liability is not clear to the Court. Fletcher's brief focuses her argument on Dr. Kubacki. The brief mentions Dr. Kominsky once, but that reference appears to be a mistake. The brief recites that MCARE was notified of Dr. Kominsky's retirement in 2000, an event that would trigger tail coverage. However, Dr. Kominsky died in 1998. It was Dr. Kubacki that retired in 2000. Thus, the only reference to "Dr. Kominsky" actually appears intended to refer to Dr. Kubacki. Further, at oral argument, counsel for MCARE noted that Fletcher appeared not to be seeking reimbursement from Dr. Kominsky, and Fletcher did not respond.

all surcharge owed to MCARE at the time their claims-made policies were purchased.

▋ The malpractice complaint alleged that Decedent was the victim of negligence over a ten-year period from 1991 through 2001, when Decedent died. Where a malpractice claim is based upon a series of negligent acts that take place over time, the plaintiff may not assert a claim under each policy covering that period of time and stack the maximum amount of coverage provided under each policy.[9] Rather, only one policy from those issued over the relevant years will be liable for the claim. In such a case, our Superior Court has held that the insurance policy issued in the year in which the plaintiff first manifested symptoms becomes the policy that covers the malpractice claim. *See D'Auria v. Zurich Ins. Co.*, 352 Pa.Super. 231, 507 A.2d 857, 861 (1986), wherein the court stated "[a]n occurrence happens when the injurious effects of the negligent act *first manifest themselves* in a way that would put a reasonable person on notice of injury." *Id.* (emphasis in original). Further, the occurrence takes place when the "*injury* is reasonably apparent, *not* at the time the *cause* of the injury occurs." *Id.* at 862 (emphasis in original).

Fletcher asserts the Decedent's injury occurred in 2000 because that is when his injury "became reasonably apparent." From the beginning of Decedent's malpractice lawsuit, that was Fletcher's position. She points to paragraph 15 of the underlying medical malpractice complaint, which states:

> 15. *In approximately mid-year 2000* plaintiff's decedent, Timothy Fletcher, *started* to become severely fatigued and complaining of right shoulder and arm pain. These complaints were made known to Dr. Simon who at the time was filling in for the other physicians in this case.

Malpractice Complaint, ¶ 15 (emphasis added). Notably, this was Fletcher's position long before it could be known that the date would have significance with respect to this MCARE coverage dispute.

MCARE opposes the motion for summary judgment for two reasons. First, MCARE argues that Fletcher is not entitled to summary judgment because there are material factual issues in dispute. These facts include the apportionment of liability among the physicians who treated Decedent from 1991 to 2001, making summary judgment beyond our ability to grant.[10] MCARE asserts that because one of the physician defendants named in Fletcher's complaint settled, *i.e.*, Dr. Simon, it is not known whether the verdict in question should be reduced by Dr. Simon's *pro rata* share of liability. Second, MCARE argues that Fletcher is not entitled to payments because the medical defendants are not eligible for MCARE coverage because they did not have primary coverage in place when Fletcher filed her claim and had not paid the requisite surcharge to MCARE. In any case, medical defendants' course of malpractice began in

---

9. In her brief, Fletcher argued that every act of negligence constituted a new occurrence and, as such, MCARE was liable for occurrences over the course of multiple years. At oral argument, Fletcher conceded that the multiple acts of negligence established in this case equaled only one occurrence. She now asserts that 2000 was the year of the occur-

rence, based on the facts alleged in the medical malpractice complaint.

10. Fletcher concedes the verdict sheet has not been made part of the record. All that has been provided is a copy of the trial court docket showing entry of judgment. *See* Fletcher Brief, Exhibit I.

1991, before the inception of PHICO coverage.

In response to MCARE's first argument that Dr. Simon's settlement precludes a grant of summary judgment, Fletcher filed a Joint Tortfeasor Release executed by Fletcher and Dr. Simon. That Release expressly states that Fletcher's recovery against the other defendants will not be reduced by Dr. Simon's settlement unless Simon is judicially determined to be a joint tortfeasor. MCARE countered by filing a motion to strike the Release, arguing that the Release should have been filed with the motion for summary judgment.

■ We begin with MCARE's motion to strike. As we explained in *Commonwealth v. Diamond Shamrock Chemical Company*, 38 Pa.Cmwlth. 89, 391 A.2d 1333, 1337 (1978), summary judgment will be based on "the record at the time the motion is filed or made part of the record concurrent with the filing of the motion." However, in response to the motion the "adverse party may supplement the record." Pa. R.C.P. No. 1035.3(b). Further, the court may permit "[s]upporting and opposing affidavits." Pa. R.C.P. No. 1035.4. Thus, this Court, as a matter of discretion, may permit "further affidavits" to be filed by the party moving for summary judgment. *Id.*

■ Here, Fletcher filed the Release and supporting affidavit in response to MCARE's assertion that Dr. Simon was a joint tortfeasor and, thus, partially liable for the malpractice verdict entered in favor of Decedent. MCARE's assertion was not anticipated at the time Fletcher filed her summary judgment motion and, thus, she did not include the Release as a document in support of her motion. It is within the Court's discretion to allow the record to be supplemented by the Release, and we do so here. Accordingly, we deny MCARE's motion to strike.

We turn now to the motion for summary judgment. Fletcher requests a judgment that MCARE is liable for excess coverage for malpractice of Dr. Kubacki and Medical Associates that took place from 1997 through 2001. MCARE's response to this argument is that the medical defendants lacked primary coverage and, in any case, MCARE was not paid the required surcharge. MCARE concedes that it was paid the requisite surcharge at the time the claims-made policies were issued to the defendant medical providers, but it denies that it was paid a specific surcharge to cover "tail" claims, *i.e.,* those presented after expiration of the claims-made PHICO policies.

Fletcher notes that in MCARE's answer to Fletcher's interrogatories, it stated that

[o]n December 13, 2004, PHICO reported primary insurance tail coverage, or its substantial equivalent, for Dr. Kubacki.

Fletcher Brief, Exhibit B, at 3. Further, on December 21, 2001, PHICO notified the CAT Fund that it was providing tail coverage for any physician it had insured for at least 48 months prior to retirement at no additional premium. Fletcher Brief, Exhibit B, at 12. Dr. Kubacki retired in April of 2000. In addition, in its answers to interrogatories, PHICO stated that from 1997 onward, MCARE charged healthcare providers the identical surcharge regardless of whether they held a claims-made or occurrence policy. In sum, MCARE was paid all surcharges it was due, and there is no dispute on this fact as to 1997 and later.

MCARE concedes that PHICO provided tail coverage to Dr. Kubacki and Medical Associates for no additional premium, but it argues that this fact is irrelevant. It contends that the medical provider defendants also needed "Mcare tail coverage."

MCARE Brief at 18. In support, MCARE cites to its regulation, which states, in relevant part, as follows:

(1) The Fund will be relieved of its responsibility to a health care provider to defend and indemnify a claim reported to the Fund under section 605 of the act (40 P.S. § 1301.605) if, at *the time of the occurrence, the health care provider fails to maintain basic coverage insurance* in compliance with the act and this chapter.

(2) Notwithstanding paragraph (1), if at the time of the occurrence the health care provider is insured on a claims made basis and *thereafter failsto purchase the reporting endorsement, prior acts coverage or its substantial equivalent upon cancellatin or nonrenewal of the claims made policy,* and subsequently a claim is reported to the Fund under section 605 of the act (40 P.S. § 1301.605), the *Fund will be relieved of its responsibility* to thehealth care provider to defend and indemnify the claim under section 605 of the act.

31 Pa.Code § 242.17(d)(1) and (2) (emphasis added).

This regulation says nothing about "Mcare tail coverage." It simply requires all health care providers to have "basic insurance coverage" when a claim is presented. Dr. Kubacki and Medical Associates had "basic insurance coverage" and an "extended reporting endorsement." MCARE was aware of how PHICO priced its extended reporting endorsement and received reports of tail coverage. This fact is not in dispute. Further, MCARE does not identify any mechanism, let alone duty, by which Dr. Kubacki and Medical Associates could purchase the mysterious "MCARE coverage" when they received their extended reporting endorsements from PHICO.

MCARE's other surcharge argument focuses on the period from 1991 to 1997, when the surcharge calculation methodology changed.[11] MCARE argues that it was not paid a surcharge for tail coverage on policies issued between 1991 and 1997. Because it was not, it owes nothing to Fletcher. In support, MCARE cites to case law precedent.

In *Gingerlowski v. Commonwealth Insurance Department,* 961 A.2d 237 (Pa. Cmwlth.2008), a patient brought a medical malpractice action in 1994 for negligence that had occurred before 1990. MCARE refused to provide coverage because the physician had cancelled his claims-made policy in 1989 and did not purchase a tail policy. The physician testified that he was not aware that he needed to do so. This

---

11. When the MCARE fund was established the surcharge paid was based on a percentage of the premium of the primary carrier. *See* Section 701(d) of Act No. 111 of 1976, Act of October 15, 1975, P.L. 390. However, Section 701 of the act was amended, with an effective date of January 1, 1997. Act of November 16, 1996, P.L. 776, No. 135 § 3. Now Section 702 of the act provides that the basis for the surcharge is the "[p]revailing primary premium" which is the "schedule of occurrence rates approved by the Insurance Commissioner for the Joint Underwriting Association." 40 P.S. § 1303.702. As such, the surcharge is the same regardless of whether a claims-made policy or an occurrence policy is purchased.

Court explained that MCARE regulations require "the purchase of tail coverage or its substantial equivalent" as a prerequisite to excess coverage. *Id.* at 240. Because the physician failed to do so, MCARE was not held liable for a claim filed in 1994.

In *Paternaster v. Lee*, 581 Pa. 28, 863 A.2d 487 (2004), a physician allowed his claims-made policy to lapse in 1987 and did not purchase tail coverage. A medical malpractice complaint was filed against him in 1994. Following an award of damages, coverage was sought from the CAT Fund. The Pennsylvania Supreme Court rejected the contention of the plaintiff that the CAT Fund was obligated to provide excess coverage on the claim where tail coverage had not been obtained.

In *Dellenbaugh v. Commonwealth Medical Professional Liability Catastrophe Loss Fund*, 562 Pa. 558, 756 A.2d 1172 (2000), a medical malpractice action was initiated as a result of negligent surgery performed in 1993. The physician had not paid his annual surcharge to the CAT Fund since 1991, and the CAT Fund refused to provide coverage. The Pennsylvania Supreme Court explained that the physician's failure to pay the required surcharges within the statutory time limits precluded coverage by the CAT Fund.

■ These cases are distinguishable. Fletcher does not seek coverage for a claim that may have "occurred" between 1991 and 1997. Fletcher asserts that the 2000 policy is liable for Decedent's claim. Dr. Kubacki and Medical Associates had coverage for claims occurring between 1997 and 2001, regardless of when the claims were reported to the insurer. Likewise, the medical defendants were current on their MCARE surcharges during that period of time.

MCARE's position that it does not owe excess coverage on claims attributed to 1997 through 2001 must fail. However, this determination, in and of itself, does not establish liability or the amount. At oral argument, Fletcher stated that the occurrence of malpractice, for purposes of MCARE coverage, occurred in 2000. As addressed above, in examining when the occurrence first arose "we must decide at what point in time the injurious effects of the doctor's negligence first manifested themselves in a way that could be ascertained by reasonable diligence." *D'Auria*, 507 A.2d at 862.

■ The malpractice complaint stated that Decedent had 98 appointments at Medical Associates between 1991 and 2001. Malpractice Complaint, ¶ 10. It also chronicles abnormal cholesterol test results and abnormal liver function studies beginning in 1991 and abnormal blood sugar results from 1992. Malpractice Complaint, ¶ 11,12. It is then provided that "approximately mid-year 2000 [Decedent] *started* to become severely fatigued and complaining of right shoulder and arm pain." Malpractice Complaint, ¶ 15 (emphasis added).

These averments support a finding that the "occurrence" of malpractice took place in 2000, when Decedent first manifested symptoms, according to the complaint. MCARE asserts, however, that the trial transcripts, medical records and expert medical reports in the underlying case may show that Decedent actually manifested symptoms much earlier, even before 1997 when PHICO began to cover Dr. Kubacki and Medical Associates. We cannot say that there is no genuine issue as to the date of the occurrence and, thus, we must deny summary judgment as to the date of the occurrence.[12]

12. Because Fletcher has not established liability on the part of MCARE, we need not con-

Fletcher's motion for summary judgment is granted with respect to her claim that Dr. Kubacki and Medical Associates had occurrence coverage from January 1, 1997, through January 1, 2001, and had paid the surcharge to MCARE owing for coverage excess of that provided by PHICO. Summary judgment is denied as to her claim that the "occurrence," for purposes of MCARE liability, took place in 2000. On that point, there is a factual dispute.

### ORDER

AND NOW, this 26th day of August, 2011, it is hereby ORDERED that the Commonwealth of Pennsylvania, Medical Care Availability and Reduction of Error Fund's motion to strike the joint tortfeasor release is hereby DENIED and Johanna Fletcher's motion for summary judgment is GRANTED in part and DENIED in part in accordance with the attached opinion.

sider MCARE's further claim that summary judgment is not appropriate because the percentage of liability assigned to each medical provider has not been established and it is unclear what payments have been made on behalf of PHICO.